JOSEPH P. WOHRLE, ESQ. (STATE BAR NO. 143550)
JEFFREY F. ALLEN, ESQ. (STATE BAR NO. 204042)
ALLEN + WOHRLE, LLP
2800 28TH STREET, SUITE 321
SANTA MONICA, CA 90405
Telephone: (310) 392-3355
Facsimile: (310) 392-8059

DIMITRIOS P. BILLER, Esq. (STATE BAR NO. 142730)
906 Kagawa Street
Pacific Palisades, CA 90272
Telephone: (310) 459-9870
Facsimile: (310) 459-9879
biller_ldtconsulting@verizon.net

Attorneys for Plaintiffs

FILED

2009 JUL 24 PM 3: 33

CLERK US DISTRICT COURT
CENTRAL DIST OF CALIF
LOS ANGELES

BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

DIMITRIOS P. BILLER;
LITIGATION DISCOVERY &
TRIAL CONSULTING, INC., a
California corporation;

     Plaintiffs,

     v.

TOYOTA MOTOR CORPORATION;
TOYOTA MOTOR SALES,
U.S.A., INC.; CHRISTOPHER
REYNOLDS; JANE HOWARD
MARTIN; ERIC TAIRA; DIAN
OGILVIE; ALICIA McANDREWS;

     Defendants.

Case No. **CV09-5429 CAS (JEMx)**

ORIGINAL COMPLAINT FOR:
**(1)** VIOLATION OF CIVIL
RACKETEER INFLUENCED
CORRUPT ORGANIZATION ACT;
**(2)** CONSTRUCTIVE WRONGFUL
TERMINATION IN VIOLATION OF
PUBLIC POLICY; and **(3)**
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS

**DEMAND FOR JURY TRIAL**

Plaintiffs, DIMITRIOS P. BILLER and LITIGATION DISCOVERY & TRIAL CONSULTING, INC., allege:

## I. **INTRODUCTION**

1. For years, Defendants Toyota Motor Corporation ("TMC"), its United States subsidiaries, and key Toyota executives, have conspired, and continue to conspire, to unlawfully withhold evidence from plaintiffs and obstruct justice in lawsuits throughout the United States against Toyota. Many of the plaintiffs in these lawsuits sustained catastrophic and fatal injuries in rollover accidents involving Toyota vehicles.

Plaintiff Dimitrios P. Biller, the former National Managing Counsel in charge of Toyota's National Rollover Program, became aware of Toyota's conspiracy to conceal, withhold, and destroy evidence and information, and obstruct justice, during his employment at Toyota. As Toyota's in-house counsel in charge of managing some of the very cases in which Toyota was concealing evidence, Mr. Biller was in a

unique position to know the relevance of the evidence

and information that was concealed in the cases in

which it was requested by plaintiffs in discovery.  As

Toyota's managing counsel in those cases, Mr. Biller

was ethically and legally obligated to turn over the

evidence that Toyota had been concealing and

withholding, and which it continues to conceal and

withhold.

Mr. Biller repeatedly confronted Toyota executives

about the need to turn over the evidence it was

concealing and withholding, and repeatedly was told by

Toyota executives, including in-house counsel, that

Toyota would not comply with its legal duty to do so.

Despite Toyota's resistance, Mr. Biller persisted in

his efforts to convince Toyota to meet its ethical and

legal obligations to turn over the evidence it was

concealing and withholding.

When it became clear to Toyota and its executives

that Mr. Biller could not be dissuaded in his

insistence, Toyota and its executives made every effort

to prevent Mr. Biller from turning over, and even preserving, the damaging evidence the company so desperately sought to conceal. Mr. Biller was subjected to intimidation, harassment, and an uncertain future, both at Toyota and elsewhere, as a result of his efforts to comply with the legal and ethical obligations.

Mr. Biller suffered a complete mental and physical breakdown as a result of Toyota's campaign to quiet his efforts. Mr. Biller was forced to resign, enter into a Severance Agreement during a time in which he was on medical leave from Toyota due to his compromised mental and physical condition, and subjected to lawsuits and further harassment, intimidation, and retaliation by Toyota following his departure from the company.

Toyota's campaign of intimidation and harassment of Mr. Biller in the months prior to, and years following, his forced resignation from the company are part of Toyota's calculated conspiracy to prevent the disclosure of damaging evidence that it has been

concealing and withholding for years from plaintiffs, the judicial system, the United States National Highway Traffic Safety Administration ("NHTSA"), and the American public.  Mr. Biller's life, both professionally and personally, has been irreparably injured by Toyota's ruthless conspiracy and relentless effort to prevent evidence of its vehicles' structural shortcomings from becoming known.  By this action, Mr. Biller seeks to end the conspiracy of illegal and obstructive practices of Toyota aimed at him, and redress for the nearly immeasurable damages he and his family have suffered as a result.

## II. **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

**A.   Parties.**

### Plaintiffs.

2.     Plaintiff DIMITRIOS P. BILLER ("BILLER") is, and was at all relevant times, a resident of the County of Los Angeles, California and an active Member of The State Bar of California, Bar No. 142730.  BILLER has

been licensed to practice law in the State of California since December 11, 1989, and is in good standing with the State Bar of California. BILLER has been employed solely as an attorney since that time.

3. Plaintiff LITIGATION DISCOVERY & TRIAL CONSULTING, INC. ("LDT CONSULTING") is, and since October 9, 2008 has been, a California corporation with its principal place of business located in Los Angeles County, California. BILLER is, and since October 9, 2008 has been, a fifty-percent shareholder of, and the President of LDT CONSULTING.

## Defendants.

4. Defendant, TOYOTA MOTOR CORPORATION ("TMC") is, and at all relevant times was, a Japanese corporation with its headquarters in Toyota City, Aichi Prefecture, Japan.

5. Defendant, TOYOTA MOTOR SALES, U.S.A., INC. ("TMS") is, and at all relevant times was, a California corporation with its principal place of business and/or

headquarters in Los Angeles County, California. TMS is a wholly owned subsidiary of TMC. TMS is affiliated with other entities such as TOYOTA NORTH AMERICA MOTOR CORP. ("TMA") and TOYOTA TECHNICAL CENTER U.S.A. INC. ("TTC"), now known as TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC. ("TEMA"). TMC, TMS, TMA, TEMA, and TTC collectively sometimes are referred to herein as "Toyota Entities."

6. Defendant Christopher Reynolds ("REYNOLDS") is, and at all relevant times was, a resident of Los Angeles County, California. REYNOLDS is the Vice President and General Counsel of TMS. REYNOLDS was and continues to be the immediate supervisor of all managing counsel in the Legal Services Group at TMS. As the Managing Counsel for TMS, REYNOLDS is fully and completely responsible for the acts, actions, omissions, conduct, agreements and decisions that managing counsel make in managing litigation.

7. Jane Howard Martin ("MARTIN") is, and at all relevant times was, a resident of Los Angeles County,

California. MARTIN is the Assistant General Counsel in the Legal Services Group of TMS. MARTIN is, and at all relevant times was, responsible for directing, coordinating, and approving the conduct of outside counsel (including, but not limited to, the law firm Littler Mendelson, P.C.) engaged by TMS, and jointly managing and participating with outside counsel litigation in which TMS is engaged.

8. Defendant Eric Taira ("TAIRA") is the Assistant General Counsel for TMS and was the immediate supervisor of BILLER during the time period in which BILLER was employed by TMS. Upon information and belief, TAIRA resides in Los Angeles County, California.

9. Defendant Dian Ogilvie ("OGILVIE") was at the time BILLER worked at TMS the Senior Vice-President and General Counsel for TMS. OGILVIE had the same duties and responsibilities as REYNOLDS when she worked at TMS. Upon information and belief, TAIRA resides in Los Angeles County, California.

10. Defendant Alicia McAndrews ("McANDREWS") is a managing counsel in the Product Liability Group at TMS. She was and continues to be responsible for managing airbag litigation and serves as counsel to TMA by providing advice to Christopher Tinto. Upon information and belief, MCANDREWS resides in Los Angeles County, California.

11. With respect to all allegations in this Complaint, one or more Defendants knowingly participated in, approved, cooperated in, directed, and/or had actual or constructive knowledge of all activities alleged, acted in concert with all other named and unnamed Defendants pursuant to a common design with them, and/or gave substantial assistance or encouragement to other Defendants in carrying out all alleged activities. One or more Defendants profited through the unlawful acts alleged herein and willfully caused injury to the business and property interests of Plaintiffs.

**B. Jurisdiction.**

12.   This court has jurisdiction over this action pursuant to 28 U.S.C. Sec. 1331, which bestows upon the District Courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.   This court also has jurisdiction over this action pursuant to 18 U.S.C. Sec. 1962.   This court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. Sec. 1367.

**C. Venue.**

13.   Venue is proper in the Central District of California pursuant to 28 U.S.C. Sec. 1391(a) and 28 U.S.C. Sec. 1391(b)(2) because all Plaintiffs and at least one Defendant reside in this judicial district, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## D. General Background.

14.   Plaintiff BILLER holds a Bachelor's degree from UCLA and a Juris Doctor degree from Loyola Law School, Los Angeles, California.

15.   Upon graduating from Loyola Law School in 1989, BILLER began practicing law at the Los Angeles law firm Lillick, McHose & Charles.  That firm later merged with a San Francisco-based law firm called Pillsbury, Madison & Sutro.  Pillsbury, Madison & Sutro later changed its name to Pillsbury Winthrop.

16.   In 1997, BILLER was elevated from Associate to Senior Associate at Pillsbury Winthrop.

17.   In 1998, BILLER was elevated from Senior Associate to Partner at Pillsbury Winthrop.  As a Partner at Pillsbury Winthrop, BILLER became well versed and knowledgeable regarding the laws and forensic computer system search requirements pertaining to E-discovery and Electronically Stored Information ("ESI") while litigating against major corporations that had no protocol for dealing with such issues.

18. On April 15, 2003, BILLER resigned from Pillsbury Winthrop after being hired by Defendant, TMS, as National Managing Counsel in charge of TMS's National Rollover Program.

19. BILLER also was hired to advise generally, and defend the Toyota Entities in discovery proceedings in product liability cases and to manage cases in which these entities were named defendants. In this capacity, BILLER was responsible for advising the Toyota Entities regarding the information those entities were required to produce in discovery to adversaries in active and future litigation. Plaintiff also was hired to receive and review discovery requests served on TMC, send draft responses to TMC for approval, finalize responses and submit the responses for signature on the verification page. BILLER was hired to keep this process in place and make sure discovery responses in rollover litigation were consistently issued.

20. When BILLER started working in the Product Liability Group at TMS, he immediately was surprised and alarmed that the Toyota Entities were not producing ESI in the discovery process. BILLER's concern stemmed, in part, from the fact that E-discovery issues were becoming increasingly important in cases across the United States.

### Changes in the Law Regarding "E-discovery" and ESI

21. BILLER was aware that changes were afoot in the laws governing E-discovery and discovery of ESI, such as e-mails and documents stored on computers. Even though, for example, Federal Rules of Evidence, Rule 1001 had long defined "writings" as "letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation," the rise in the use of computers, the internet, and e-mail in society triggered commentators

and, ultimately, courts, to reassess discovery and evidence laws in light of these technological changes in society.

22. In 2003, four seminal decisions analyzing E-discovery and discovery of ESI were rendered in the United States District Court for the Southern District of New York: Zubulake v. UBS Warburg, 217 F.R.D. 309 (S.D.N.Y. 2003); Zubulake v. UBS Warburg, 2003 WL 21087136 (S.D.N.Y.); Zubulake v. UBS Warburg, 216 F.R.D. 280 (S.D.N.Y. 2003); Zubulake v. UBS Warburg, 220 F.R.D. 212 (S.D.N.Y. 2003). In early 2004, the final Zubulake decision was issued, Zubulake v. UBS Warburg, 229 F.R.D. 422 (S.D.N.Y. 2004). These cases established a framework governing E-discovery and discovery of ESI.

23. Additionally, in January 2004, "The Sedona Principles for Electronic Document Production" was published by The Sedona Conference, a think-tank devoted to promoting consideration and discussion of cutting-edge issues in the areas of antitrust law,

complex litigation, and intellectual property rights among leading jurists, lawyers, experts, academics, and others.   The Sedona Conference was in large part comprised of United States District and Circuit Judges and Federal practitioners.   In 2006, the amendments to the Federal Rules of Civil Procedure regarding E-discovery were implemented and required all litigants in Federal Court to comply with them in the discovery process.

     24.   Prior to and during his employment by TMS, BILLER undertook to further his knowledge of E-discovery and ESI and the new and emerging case law and theories regarding its production and use.   BILLER also developed knowledge regarding the duties of attorneys regarding the production, recovery, storage, management, and use of E-discovery given the developing landscape on these topics.

///

///

///

Criminal and Illegal Acts the Toyota Entities Committed

in Product Liability Cases in Federal & State Courts

25. Defendants are, and have, engaged in a systematic pattern and practice of discovery abuses and criminal acts in the discovery process against plaintiffs in litigation against the Toyota Entities. Starting in or about 2004, plaintiffs in product liability cases against the Toyota Entities started to serve discovery on the Toyota Entities demanding electronically stored information ("ESI"). Some of these cases included: Witherow v. Toyota; Hunsberger v. Toyota; Kurylowzic v. Toyota; Sears v. Toyota; Green v. Toyota; Campaigna v. Toyota; and Butterfield v. Toyota. Additionally, prior to 2004, plaintiffs in product liability cases against the Toyota Entities served Requests for Production of Documents that should have resulted in the production of ESI that was available to and in the possession of the Toyota Entities. In at least two cases, Kurylowic v. Toyota and Grenn v. Toyota, the United States District Court

for the District of Colorado, Denver Division and Texas State Court issued Orders compelling TMC to produce additional documents that should have resulted in the production of ESI. However, TMC either failed to produce any ESI or produced incomplete ESI.

26. In particular, the Texas State Court Ordered that TMC produce ESI and TMC failed to produce all the available ESI. BILLER conducted his own investigation of the ESI stored at TMA, a wholly owned subsidiary of TMC, and discovered that TMC failed to produce the ESI that was available and in its possession. Eric Taira ("TAIRA"), Assistant General Counsel of TMS and BILLER's immediate supervisor, instructed BILLER not to preserve that ESI. However, BILLER disregarded TAIRA's instruction because it was tantamount to the destruction of evidence and/or concealing evidence, either of which would have amounted to obstruction of justice. In August 2006, November 2006, and February 2007, BILLER caused the ESI at TMA to be searched, collected, and preserved onto a

hard drive. That ESI was, and is, relevant to product liability actions against the Toyota Entities, and never has been produced by the Toyota Entities in any product liability litigation. BILLER had custody and control of the hard drive containing the ESI preserved, but when BILLER was forced to resign TAIRA took control of the hard drive.

27. Furthermore, when BILLER was ready to produce the ESI demanded by the Texas State Court Order to Produce ESI, and that TMC failed to produce, TAIRA instructed and demanded that BILLER not produce the ESI. At that time, TAIRA told BILLER the "Golden Rule", i.e., protect the client at all cost even if that means committing illegal actions.

28. In <u>Kurylowicz v. Toyota</u>, pending in the United States District Court for Colorado, Denver Division, plaintiffs served TMC with Requests for Production of Documents. Plaintiffs were unsatisfied with TMC's responses and sought a Motion to Compel. The Federal District Court for the District Court for

Colorado issued an Order compelling TMC to produce additional documents regarding the present generation 4Runner. However, TMC failed to produce all the documents/ESI in violation of the Court Order.

29. For almost three years, between 2004 and 2007, BILLER attempted to conduct and complete investigations at TEMA, TMA, and TMC that he had initiated to search, collect, preserve, review, and produce in product liability litigation. TAIRA, Alicia McAndrews ("McANDREWS"), National Managing Counsel, and TMC made every effort to stop, prevent, and delay the completion of these investigations. After one investigation, TAIRA and TMC instructed outside counsel to "destroy" the ESI, which included documents and information that was collected at TEMA related to the design, engineering, testing and evaluation of vehicles sold in the United States. In the second investigation BILLER initiated at TEMA, TAIRA and TMC conspired to stop, prevent, and delay the completion of BILLER's investigation; as a result, TEMA was allowed to destroy

relevant information and documents that should have been produced in, approximately, over 300 rollover accidents involving roof crush issues. For example, one document "required" there to be a 20% margin when the test set forth in Federal Motor Vehicle Safety Standard ("FMVSS") 216 was complete. Engineers and witness for TMC repeatedly testified that TMC did not have a 20% "requirement." There are vehicles on the highway today that do not satisfy that requirement. The Toyota Entities have taken cases to trial in which the vehicles did not satisfy that "requirement" that resulted in defense verdicts.

30. Another example includes a testing protocol that TMC never disclosed in over 20 years of product liability litigation. As part of conducting the Dolly Rollover Test pursuant to FMVSS 208, TMC had an internal testing protocol that measured the distance between the dummies' heads and the crushed roof after the test. TMC had an internal standard of 0.55 millimeters. In other words, there had to be a

distance of 0.55 millimeters between the dummies' heads and the crushed roof. TMC never produced this data in any product liability litigation; in fact, TMC did not even inform BILLER and/or TMS's outside counsel of this internal standard and test. TMC destroyed this data in late 2005 or early 2006. This data was relevant in numerous roll over and roof crush cases spanning a period of over 20 years.

## Concealed Evidence in the *Hunsberger* Litigation

### (February, 2005)

31. Given his expertise with E-discovery and discovery of ESI, and his awareness of changes in the law governing the same, shortly after being employed by TMS, BILLER advised his immediate supervisor, TAIRA, that TMS and the Toyota Entities were ill-prepared to address E-discovery and ESI issues. Moreover, during October, 2003, BILLER made a presentation at TMC's Japan headquarters to show TMC senior management how TMC and the Toyota Entities, including, without

limitation, TMS, were ill-prepared to address E-discovery and ESI issues.  BILLER encouraged the implementation of a strategy and plan to address the E-discovery and ESI shortcomings of TMC and the Toyota Entities.

32.   In addition to his duties regarding discovery issues, BILLER also handled litigation for TMS.  For example, during February, 2005, BILLER was Managing Counsel for TMS in a case called <u>Hunsberger v. Toyota</u>, which was venued in United States Federal District Court in Mississippi.

33.   In <u>Hunsberger</u>, plaintiffs claimed that the roof structure of their 1996 Toyota 4Runner was defectively designed because it did not provide adequate roof strength to properly protect the occupants in a foreseeable rollover accident.  In February 2005, plaintiffs' counsel, Tab Turner, took the deposition of Chris Tinto, Vice President of TMA, who testified to the existence of e-mails and ESI in

the possession of TMA which pertained to the claims at issue.

34.   TAIRA attended the deposition of Chris Tinto for BILLER because BILLER was involved in another case in Houston, Texas.   TAIRA did not make any reports to BILLER about the deposition testimony of Chris Tinto despite the fact that BILLER was managing the Hunsberger case.   BILLER called outside counsel and asked for a summary of the testimony.   BILLER then learned that plaintiffs' counsel, Mr. Turner, was seeking to discover e-mails and ESI from the Toyota Entities.   Shortly after this deposition, Mr. Turner demanded that the Toyota Entities produce the e-mails and ESI that Chris Tinto disclosed at his deposition. The requested ESI, information, and documents never were produced to Tab Turner or the plaintiffs in Hunsberger v. Toyota.

FMVSS 216 and Vehicle Roof Strength Standards

35.   At least since 1996, and continuing to the present, NHTSA has been investigating the adequacy of FMVSS 216 and other rules governing vehicle roof strength and has been proposing changes to FMVSS 216.

36.   As part of its investigation, during August 2005, NHTSA announced proposed changes to FMVSS 216. NHTSA asked for information from manufacturers, including TMC, regarding its proposed changes.  Through a legislative lobbying group, TMC and TMA each provided NHTSA with information.  TMC withheld the original engineering report concluding that TMC could start manufacturing vehicles under the new standards of FMVSS 216 within the time NHTSA recommended.  Instead, TMC hired another engineering firm to give a second, different opinion, and that second report was provided to NHTSA.  The original report never was provided and was "buried."

///

///

///

## Plaintiff Requires Psychiatric Treatment; Continues

## Working at TMS

37.    Feeling and suffering from, among other things, frustration, anxiety, insomnia, and exhaustion, BILLER sought psychiatric treatment from Alice Rudnick, M.D., for the first time, in October, 2005.  BILLER's treatment centered on his work situation and, specifically, the policies of TMC and TMS regarding disclosure of documents and other information in discovery, as well as the problems BILLER was encountering in his efforts to convince TMC and TMS and the other Toyota Entities to comply with discovery laws and ethical obligations.

38.    Meanwhile, during May, 2006, BILLER attended an E-discovery seminar hosted by the Defense Research Institute and conducted by United States District Judge Shira Scheindlin, Southern District of New York, the author of the <u>Zubulake</u> decisions discussed above.  (During February, 2006, the <u>Federal Rules of Civil Procedure</u> were amended to incorporate

the E-discovery principals set forth in the <u>Zublake</u> decisions.)  BILLER prepared a written report to his superiors at TMC and TMS regarding this seminar.  He received no response.

39.  BILLER made numerous efforts to correct the criminal and fraudulent acts TMC, TMS, and the Toyota Entities were committing in the discovery processes in product liability cases pending in United States Federal and State Courts.  BILLER had three separate meetings with Senior Vice President and General Counsel Dian Ogilvie ("OGILVIE") in December 2006, March 2007, and May 2007.  During these meetings BILLER told OGILVIE that:  (a) TMS and TMC were in the process of destroying evidence at TEMA; (b) TAIRA would not allow BILLER to complete his investigation at TEMA in order to insure the Toyota Entities legal compliance and to preserve evidence; and (c) TMC and the Toyota Entities were committing illegal acts in connection with discovery.

40.    In April 2007, BILLER prepared a 23-page
memorandum ("The 23-Page Memo") in response to the 2007
Performance Appraisal TAIRA wrote regarding BILLER's
2006 work performance.   The 23-Page Memo detailed how
the Product Liability Group was "dysfunctional" and how
TAIRA was allowing and causing TMS and TMC to violate
laws, obstruct justice, and commit criminal and
fraudulent acts during the discovery processes in
specific cases.   BILLER prepared The 23-Page Memo
expressly to correct misstatements and mis-
characterizations TAIRA made in BILLER's 2007
Performance Appraisal.   BILLER did not intend The 23-
Page Memo to be confidential and, in fact, insisted
that it be placed in his personnel file for anyone to
see.

41.    BILLER sent The 23-Page Memo to TAIRA and
OGILVIE and requested a meeting with them to discuss
its contents.   OGILVIE told BILLER that:   (a) she did
not want The 23-Page Memo because it was
"discoverable"; and (b) that BILLER could prepare his

own appraisal to avoid having a meeting over the contents of The 23-Page Memo. BILLER refused OGILVIE's offer and OGILVIE handed The 23-Page Memo back to BILLER because she did not "want to have possession of the document because it is discoverable."

42.  Thereafter, on or about May 31, 2007, a meeting regarding the contents of The 23-Page Memo took place between TAIRA and BILLER in the presence of TMS's Vice President of Human Resources, Matthew Gonzales. In that meeting, BILLER asked TAIRA to sign The 23-Page Memo to acknowledge and confirm that he had received and read it. Both TAIRA and BILLER signed The 23-Page Memo (on the 23rd page) in the presence of Mr. Gonzalez. Either BILLER or TAIRA dated The 23 Page Memo. BILLER handed The 23-Page Memo to Mr. Gonzales and requested that it be placed in BILLER's personnel file. Mr. Gonzales agreed to place The 23-Page Memo in BILLER's personnel file.

43.  After BILLER was forced to resign from TMS on September 17, 2007, and after engaging in two

separate legal disputes with TMS (which are discussed more fully below), he requested his entire personnel file from TMS, including The 23-Page Memo signed by both BILLER and TAIRA. TMS provided BILLER with his personnel file, but the version of The 23-Page Memo which was included therein did not contain the signature page containing the signatures of BILLER or TAIRA. Exhibit "1" is a true and correct copy of The 23-Page Memo (which does not include the page containing the signatures of BILLER or TAIRA) BILLER received from TMS after he was compelled to resign. TMS now admits in responses to discovery in a related case (that case is entitled <u>Dimitrios P. Biller v. Los Angeles County; Los Angeles District Attorney's Office; Victor Rodriguez; Pam Brookwell</u> (Case No. CV09-03079-GHK-RZx)) ("<u>BILLER v. LADA's Office</u>") that the signature page of The 23-Page Memo does not exist. In other words, TMS has destroyed the signature page with BILLER'S and TAIRA's signature and date.

44. During this time, in approximately May and June 2007, BILLER had numerous conversations with OGILVIE about his career at TMS. OGILVIE told BILLER that his career as an attorney would be over if he made a claim against TMS for Constructive Wrongful Discharge and his claim became known in the legal community. This statement clearly was a threat to prevent BILLER from filing a lawsuit for Constructive Wrongful Discharge and in furtherance of Defendants' conspiracy to conceal and withhold evidence. Additionally, OGILVIE strongly suggested that BILLER resign from TMS or she would have to move him out of the Product Liability Group into an unknown position. Again, BILLER was threatened by Defendants in direct response to his efforts to insure compliance with clear legal and ethical obligations.

45. At the same time, TAIRA and McANDREWS made a false internal complaint about BILLER; they claimed he sent an e-mail containing "offensive" and/or "defamatory" statements. The internal complaint filed

with Human Resources was false and BILLER was not reprimanded.  The e-mail that BILLER sent which was the subject of the false complaint made by TAIRA and McANDREWS had attached to it his minutes/notes regarding statements made during a 3-day meeting between TMC and TMS regarding E-discovery.  BILLER demanded the meeting to resolve approximately 28 issues related to E-discovery.  One of the issues related to the "Books of Knowledge", also known as the "Know How" books, and computer systems containing relevant information and ESI that TMC and the Toyota Entities had not produced in product liability litigation.  The identities of these computer systems ("TRIM" at TEMA and "K!!T" at TMC) were not even disclosed and have yet to be disclosed.  In fact, TMC took the position that TMC would never disclose the information contained in these computer systems or the computers themselves. BILLER attempted to persuade TMC to identify the systems, conduct searches for relevant ESI in the systems, preserve the ESI, and ultimately produce

relevant and potentially relevant ESI in product liability litigation. TMC refused.

46. Instead, TMC and McANDREWS conspired to conceal and withhold the computer systems and ESI contained in the systems. In a meeting at which BILLER was present, McANDREWS stated that TMC should raise boilerplate objections whenever it received discovery demands requesting the information; TMC should not raise the valid objections of Trade Secret, Confidentiality, and Competitive Advantage because such objections would raise a red flag for plaintiffs and they would file motions to compel; and TMC should not produce the information. TAIRA did not object to this conspiratorial scheme, thereby agreeing with the scheme, so BILLER was forced to object and inform everybody that the Toyota Entities were not going to "conceal" or "hide" evidence while he worked at TMS. BILLER's minutes/memo of that meeting confirm the above.

47.   In June, 2007, BILLER went on medical leave from TMS as a result of the fact that, given his hostile and untenable work situation, BILLER was diagnosed with Major Depressive Syndrome and other psychiatric and physical problems.  BILLER was being treated by Alice Rudnick, M.D., for these medical problems.

## BILLER Presents Constructive Wrongful Discharge Claim, Which is Settled in Three Months

48.   The emotional and physical problems from which BILLER was suffering, and for which he was being treated, forced him to take a medical leave of absence from TMS in June 2007.  BILLER realized at this time that Defendants would not satisfy his demands, and meet their legal obligations, to preserve and produce relevant and necessary information and documents in ongoing and future product liability litigation. Moreover, Defendants would not stop concealing, withholding, and destroying relevant evidence which

BILLER had uncovered and sought to produce and preserve.  Given his ethical and legal duties as an attorney for TMC, TMS, and the Toyota Entities, BILLER was presented with the option of resigning from TMS or acquiescing and joining the illegal conspiracy to conceal relevant evidence and obstruct justice.  In other words, as an attorney, BILLER had no option but to resign from his employment because Defendants would not comply with the law.

49.  At this time, BILLER was aware of the legal principles and consequences for not following E-Discovery rules set forth in Qualcom Inc. v. Broadcom Corp, 2008 U.S. Dist. LEXIS 911, 2008 WL 66932 (S.D.Cal. Jan. 7, 2008), and its ramifications to him and his current predicament.  BILLER also was aware of Rule 3-700 of the California Rules of Professional Conduct, which states:  "a lawyer shall withdraw from employment if the lawyer knows or should know that continued employment will result in a violation of these rules or the client insists that the lawyer

pursue a course of conduct prohibited under these rules." BILLER also was aware of Rule 5-220, which states: "a lawyer shall not suppress evidence that the lawyer or the lawyer's client has an obligation to reveal."

50. BILLER realized that Defendants intended to rely upon these laws and rules to compel his resignation, despite TMS's subterfuge of offering him a new, indeterminate position outside of the Products Liability Group. Defendants expressly were aware of the legal and ethical dilemma BILLER faced and perpetuated the conspiracy to conceal evidence, in part, by compelling BILLER's resignation and taking the position that he was unable to divulge any of the facts he uncovered because of the Attorney-Client Privilege.

51. While on a medical leave from TMS, BILLER presented TMS with a claim asserting, inter alia, constructive wrongful discharge. This claim was settled by TMS in shortly over two months without a lawsuit having been filed, for the sum of $3.7 million.

The Severance Agreement documenting the settlement was signed on September 17, 2007. The monetary figures contemplated by the Severance Agreement were agreed to shortly after a mediation that occurred on August 9, 2007. At the time BILLER agreed to accept TMS's monetary settlement offer, on the evening after the mediation, BILLER's lawyer, Michael Faber, persuaded BILLER to accept the monetary settlement offered by reducing his contingency fee. Also at that time, BILLER was being treated, and medicated, for the psychiatric and physical problems from which he was suffering as a result of Defendants' campaign of harassment, intimidation, and coercion in furtherance of the conspiracy to conceal, withhold, and destroy evidence they were legally and ethically required to disclose and preserve.

52. The terms of the Severance Agreement were prepared by counsel for TMS in late August 2007. TMS's counsel during these negotiations and mediation was Alan Carlson of Littler Mendelson, P.C. BILLER's

lawyer, Mr. Faber, did not negotiate any significant terms of the Severance Agreement, including the Confidentiality Clause, Non-Disparagement Clause, Liquidation of Damages Clause, and Arbitration Clause contained therein. Some of the principal terms of the Severance Agreement are that BILLER cannot disclose what was given, transmitted, furnished or obtained by him about TMS's and the Toyota Entities' policies and practices regarding E-discovery and ESI, and that BILLER must arbitrate any claims he has involving TMS, except those, such as in the instant case, wherein injunctive relief is sought. A true and correct copy of the Severance Agreement is attached as Exhibit "2."

53. The Severance Agreement, which was drafted by TMS, Defendants, and their counsel, Littler Mendelson, P.C., is being used as a means to further conceal and withhold the knowledge and evidence of wrongdoing that compelled BILLER's resignation.

54. The "Confidentiality Clause" in the Severance Agreement is an illegal and against public

policy. The Confidentiality Clause is designed, and Defendants have used it, to compel BILLER's silence and withhold and conceal information, documents, ESI, and other evidence from plaintiffs involved in lawsuits against Toyota. The Confidentiality Clause also is designed, and Defendants have used it illegally, to withhold and conceal information, documents, ESI, and other evidence, obstruct justice, and to further their conspiracy to prevent BILLER from legally utilizing or revealing evidence and information, in litigation and other matters regarding BILLER. The Confidentiality Clause is another weapon in the arsenal Defendants have used, and are using, to conspire to and actually conceal, destroy, and withhold evidence in violation of California Penal Code Sections 132, 134, 135, 115 and 182. As such, Defendants are using the Confidentiality Clause to obstruct justice, commit mail fraud, and tamper with witnesses and evidence. BILLER reserves all of his rights and does not waive any position he has or may have regarding the enforceability of the

Severance Agreement or the Confidentiality Clause

therein by the foregoing, especially in light of the

facts alleged below.

55.    Immediately upon being compelled to resign,

BILLER suffered a complete emotional breakdown because

of the stress created by Defendants' refusal to follow

the laws, their decision to continue to conceal,

withhold, and destroy evidence, the intimidation and

harassment they employed to compel BILLER's silence,

and the compelled resignation their actions

precipitated.    BILLER was unemployed for the first time

since graduating from law school.    BILLER was suffering

from, among other things, major and chronic depression

and was heavily medicated.    BILLER's cognitive

abilities were compromised and diminished, and he was

unable to exercise sound judgment.    His personal and

family life was devastated.    To this day, BILLER

continues to suffer from major/chronic depression and

Post Traumatic Stress Disorder.    He has been unable to

hold a job do to his condition, and remains unemployed to this day.

TMS Continues Its Campaign of Intimidation and Harassment of, and Retaliation Against, BILLER in Furtherance of the Conspiracy to Compel BILLER's Silence; BILLER Enters Into a Second Settlement Agreement With TMS

56.   Soon thereafter, in January 2008, while BILLER still was suffering the debilitating effects of his compelled resignation and resultant breakdown, he learned about defamatory statements that Alicia McAndrews ("McANDREWS") was making about him as an attorney and person.

57.   BILLER brought these statements to the attention of TMS, and the dispute was resolved when the parties executed a second settlement agreement. (Before the dispute was resolved, however, BILLER was threatened by TMS with an action against him for civil extortion.   Since this dispute arose, BILLER repeatedly

has been threatened by Defendants and their counsel with a civil extortion lawsuit. The obvious irony in this threat is the fact that Defendants are the ones harassing, threatening, intimidating, and taking retaliatory actions against BILLER.) As part of the second settlement agreement, Christopher Reynolds ("REYNOLDS"), General Counsel and Senior Vice President of TMS, wrote a letter of recommendation for BILLER dated April 3, 2008 ("2008 Letter of Recommendation"). A true and correct copy of the 2008 Letter of Recommendation is attached hereto as Exhibit "3".

58. The 2008 Letter of Recommendation purposefully was designed for BILLER to distribute to third parties in an effort to assist him in finding employment and/or earning a living. The 2008 Letter of Recommendation was written to BILLER when he was neither a lawyer for, nor employee of, TMS. The 2008 Letter of Recommendation states, in part:

> "During your legal representation of
> Toyota, you also assumed
> responsibilities for or participated
> in several non-litigation initiatives:

within the Legal Services Group to
help ensure the Company's compliance
with new laws impacting it.
Consistent with Toyota's past and
present commitment to recognize and
comply with developing areas in the
law, your efforts were always directed
to giving the Company your best legal
advice to achieve this goal and help
insure Toyota's compliance efforts."

59.     Despite the statements made in the 2008 Letter of Recommendation, TMS filed a lawsuit against BILLER (which is discussed more fully below), in part, allegedly for disclosing some of the very statements and information contained and referenced therein. Moreover, TMS has sought, and continues to seek, to preclude statements and information detailed in the 2008 Letter of Recommendation from disclosure in the action it filed against BILLER, claiming it constitutes "confidential information" which BILLER cannot disclose, even in his own defense, pursuant to the Severance Agreement.  Defendants' efforts to preclude BILLER from relying upon non-confidential statements and information contained in the 2008 Letter of Recommendation further evidence Defendants' ongoing

conspiracy to conceal evidence by compelling BILLER's silence. Defendants' conspiracy to conceal, withhold, and destroy evidence, and obstruct justice continues to injure BILLER to this day. For example, even though the Superior Court for the State of California, in the action by TMS against BILLER (discussed below), refused to seal the 2008 Letter of Recommendation and the Severance Agreement (except for one clause), TMS sought an Order to seal the documents from the U.S. District Court for the Central District of California in BILLER v. LADA's Office -- an action in which TMS is not even a party. As a result, BILLER had to spend a substantial period of time to oppose TMS's efforts.

### BILLER Establishes LDT CONSULTING, Which TMS Promptly Shut Down in Furtherance of Its Conspiracy

60. Because he needed to try to earn a living, during 2008, drawing on his extensive knowledge in the areas of E-discovery, Settlement Negotiations, Trial Preparation, Trial Presentation and Taking and

Defending Depositions, BILLER established a consulting

firm called Litigation Discovery & Trial Consulting,

Inc. ("LDT CONSULTING").  The mission of LDT CONSULTING

was, among other things, to educate and train lawyers

regarding the five subject areas listed above.  BILLER

was certified as an Activities Instructor and LDT

CONSULTING was approved as a provider of Mandatory

Continuing Legal Education ("MCLE") by The State Bar of

California, thereby enabling attendees of seminars

conducted by LDT CONSULTING to obtain credit toward

their MCLE requirements.  BILLER is a 50% shareholder

and President of LDT CONSULTING.

61.    However, TMS alleged that the operation of

LDT CONSULTING violated the Severance Agreement.  TMS

alleged that presentations made and materials offered

by LDT CONSULTING contained confidential information,

and that the use of such confidential information by

LDT CONSULTING was prohibited by the terms of the

Severance Agreement.  For example, LDT CONSULTING had a

web-site setting forth information about BILLER's

background at TMS, including the names of cases that he managed through trial. TMS took the position that the names of these cases were "privileged" although the names are a matter of public record. TMS has alleged that information regarding everything BILLER did while representing it and its affiliates is "confidential information." Counsel for TMS, again from the law firm Littler Mendelson, P.C., further alleged that BILLER could not even inform anybody that he worked for TMS. Counsel for TMS alleged that Rule 1.6(a) of the <u>Model Rules of Professional Conduct</u> supported this position, as well as the Confidentiality Clause in the Severance Agreement. Counsel for TMS demanded that BILLER take down the web-site for LDT CONSULTING and provide TMS with information regarding the number of "hits" on the web-site; counsel for TMS alleges that each web-site "hit" is a separate disclosure for which TMS will seek $250,000 in damages based on the Confidentiality and Liquidation of Damages Clauses contained in the Severance Agreement.

62.   TMS filed a complaint against BILLER and requested a temporary restraining order that resulted in shutting down LDT CONSULTING.   That case is called TOYOTA MOTOR SALES, U.S.A., INC. v. DIMITRIOS P. BILLER (Los Angeles Superior Court Case No. SC 100501) ("TMS v. BILLER").   The same day TMS filed its complaint, it obtained, ex parte, a temporary restraining order, enjoining BILLER from operating LDT CONSULTING.   BILLER stipulated to the TRO and requested a hearing date on March 19, 2009 to give BILLER enough time to conduct discovery.   BILLER'S stipulation was based, in large part, on the declarations TMS filed in support of the complaint, the language in the complaint, and the intimidating and expensive prospect of defending himself against TMS.   In other words, TMS and its Counsel were misusing the Confidentially Clause as a "sword", not a "shield," to prevent BILLER from making any statements or representations regarding his employment at TMS – even the fact that he worked at TMS for almost 5 years.   Essentially, TMS wanted to and

continues to compel BILLER's silence by destroying his ability to practice law and by eliminating almost 5 years of his practice and work history. TMS also is using the Liquidation of Damages Clause for $250,000.00 per alleged violation of the Severance Agreement as a "sword" to destroy BILLER's life as a lawyer and protect its dirty secrets.

63. The declarations that TMS filed in support of its TRO request in TMS v. BILLER included those of Jeffrey Katz and Daniel McKenzie, both attorneys licensed by the State Bar of California. The declarations of Katz and McKenzie stated that they attended LDT CONSULTING seminars that BILLER presented. Their declarations further state that BILLER made statements during two LDT CONSULTING seminars which allegedly violated the Confidentiality Clause contained in the Severance Agreement. However, the declarations of Katz and McKenzie concealed at least the following material facts: (a) both Katz and McKenzie were retained by TMS, or counsel for TMS, to attend the LDT

CONSULTING seminars; (b) Katz and McKenzie knowingly and intentionally asked questions of BILLER during the seminars which specifically were designed to elicit the statements upon which TMS's lawsuit is predicated; and (c) Katz and McKenzie made affirmative misrepresentations regarding their backgrounds, the purpose of their attendance at the LDT CONSULTING seminars, and level of experience as lawyers. In other words, the declarations of Katz and McKenzie did not reveal that they were hired by TMS, or counsel for TMS, to secretly monitor BILLER and LDT CONSULTING, and to entrap BILLER into making statements upon which TMS could predicate an action against BILLER.

64. TMS's act of hiring Katz and McKenzie were in furtherance of Defendants' conspiracy to conceal evidence and compel BILLER's silence. TMS intentionally manufactured the lawsuit it filed against BILLER (i.e., TMS v. BILLER) by, among other things, employing Katz and McKenzie to attend seminars and elicit allegedly confidential information from BILLER,

and then relied upon false or misleading declarations in order to shut down LDT CONSULTING. TMS committed these acts in furtherance of the conspiracy to conceal, withhold, and destroy evidence and information, and obstruct justice, and injured Plaintiffs as a result.

65. As a result of the TRO, and the threats that TMS and its Counsel made that TMS will seek $250,000 for any and all alleged disclosures that BILLER made regarding any information that related to his employment at TMS, BILLER was forced to close down LDT CONSULTING. Moreover, since being compelled to resign from TMS, BILLER has been forced to devote his life to protecting himself, his family, and LDT CONSULTING from the efforts of the Toyota Entities to compel BILLER's silence. This devotion has limited, and effectively destroyed, BILLER's ability to earn a living.

66. BILLER, on behalf of himself and LDT CONSULTING, never would have stipulated to the TRO if the information now known by BILLER was disclosed in

TMS's complaint and the declarations of Katz and McKenzie filed in support of the TRO.

67.    Following the stipulation to enter the TRO, TMS sought to compel BILLER to arbitrate not only TMS's claims against BILLER, but any claims that BILLER had against TMS, citing the Arbitration Clause in the Severance Agreement.

68.    Throughout the TMS v. BILLER litigation, which is ongoing, TMS and its Counsel repeatedly have raised and asserted objections of Attorney-Client Privilege and "confidentiality" whenever BILLER attempts to introduce evidence on his behalf related to his employment at TMS.  In response to these objections, BILLER has asserted the applicability of the Crime/Fraud Exception and Breach of Duty Exception under California Evidence Code Sections 956 and 958. TMS and its Counsel never produced or presented any declarations from any TMS employees refuting BILLER's position that Defendants retained and used BILLER, unknowingly, to aid and help Defendants' conspiracy to

commit crimes and frauds; TMS and its Counsel never
addressed the leading case regarding the Crime/Fraud
Exception (<u>State Farm Fire & Casualty Company v.
Superior Court</u> (1997) 54 Cal. App. 4th 625). Instead
of addressing the issues, TMS moved the Court to
initiate criminal contempt proceedings against BILLER
because in <u>BILLER v. LADA's Office</u> he filed with the
United States District Court The 23-Page Memo. TMS's
drastic move to seek a criminal contempt ruling from
the court based upon BILLER's effort to disclose
evidence, as required by Rule 26(a) of the <u>Federal
Rules of Civil Procedure</u>, in <u>BILLER v. LADA's Office</u> is
in furtherance of its systematic campaign to harass,
intimidate, and retaliate against BILLER in order to
compel his silence and conceal and withhold evidence
and information. The failure of TMS and its Counsel to
address the Crime/Fraud Exception in the many pleadings
that asserted the applicability of the exception, and
their decision to instead pursue baseless criminal
contempt charges against BILLER, is an admission that

Defendants and the Toyota Entities have been engaging
in a conspiracy to conceal, withhold, and destroy
evidence and information, and obstruct justice, in
litigation involving TMC and the Toyota Entities.  TMS
and the Toyota Entities are using the TMS v. BILLER
litigation as a tool to compel BILLER's silence
regarding these facts and to destroy his professional
and personal life.

69.  BILLER has been a victim of the conspiracy
to conceal, withhold, and destroy evidence and
information, and obstruct justice, that Defendants have
perpetrated, and which they continue to perpetrate.
BILLER and TMS have been engaged in ongoing litigation
from 2007 to the present time.  After BILLER was
compelled to resign from TMS, BILLER requested a copy
of his personnel file from TMS.  As previously stated,
TMS produced BILLER's personnel file.  However, TMS did
not produce, and therefore concealed and withheld, the
signature page of The 23-Page Memo referred to at
paragraph 40 herein.  Upon information and belief, TMS

destroyed the signature page because it wants to avoid having to produce the entirety of The 23-Page Memo which contains facts evidencing the Toyota Entities conspiracy to illegally conceal, withhold, and destroy evidence and information, and obstruct justice, and which bears the signature of Vice President and Assistant General Counsel TAIRA.  The 23-Page Memo containing TAIRA's signature proves that senior management at TMS, at least, had knowledge of the conspiracy to, and commission of, criminal and fraudulent acts by Defendants in the form of concealing, withholding, and destroying evidence in pending and ongoing litigation.

70.    Relying upon the Arbitration Clause in the Severance Agreement, TMS moved to compel TMS v. BILLER into arbitration.  TMS insists upon arbitrating the claims alleged therein in order to insure that evidence of its wrongdoing, which BILLER must rely upon in his defense, is not revealed to the public.  In other words, TMS is relying upon the Arbitration Clause

contained in the Severance Agreement to compel BILLER's continued silence and further its conspiracy to conceal, withhold, and destroy evidence and information, and obstruct justice. As stated, TMS also seeks to hold BILLER in contempt of court simply for attempting to introduce evidence in his defense.

### TMS Intervenes in BILLER v. LADA's Office to Compel BILLER's Silence and Further the Conspiracy

71. In May 2009, BILLER was employed by the Los Angeles District Attorney's Office ("LADA's Office") as a Deputy District Attorney I. BILLER sustained Post Traumatic Stress Disorder on August 14, 2008, when Victor Rodriguez (BILLER'S immediate supervisor at the LADA's Office) and Pam Brookwell made a false and frivolous complaint against BILLER because he complained about Sheriff's Deputies failing to appear as required in Hearings to Suppress Evidence, Trials, Preliminary Hearings, or for appearing late or

without evidence at all. BILLER was terminated from his position with the LADA's Office.

72. BILLER filed a lawsuit (<u>BILLER v. LADA's Office</u>) for wrongful discharge and other claims. BILLER alleges that he was discharged wrongfully in violation of the Americans with Disabilities Act because he informed County employees that he suffered from depression and dyslexia, and his emotional breakdown that occurred was based on his existing mental illness; BILLER sustained Post Traumatic Stress Disorder as a result of the events that occurred while he was employed at the LADA's Office specifically because of BILLER'S experience at TMS. BILLER sustained Post Traumatic Stress Disorder when similar events occurred at the LADA's Office.

73. While at TMS, TAIRA and McANDREWS filed a false and frivolous complaint against BILLER. While BILLER was not punished directly as a result of the complaint they filed, he did sustain Major Depressive Disorder and his psychiatrist predicted that BILLER

would suffer Post Traumatic Stress Disorder if he experienced another event similar to the one he experienced at TMS.

74. Defendants are not parties to BILLER v. LADA's Office. However, Defendants have interfered with BILLER's rights in that action. Specifically, on June 18, 2009, Defendants filed ex parte applications to stay discovery and a complaint in intervention. However, the first two ex parte applications filed by Defendants were denied. Within two weeks, Defendants filed a third ex parte application and sought to seal portions of The 23-Page Memo, the 2008 Letter of Recommendation, and the Severance Agreement. That ex parte application also was denied. (The Superior Court in TMS v. BILLER previously denied a request by TMS to seal the 2008 Letter of Recommendation and Severance Agreement. In spite of that denial, and in its desperation to conceal the very evidence BILLER needed to support his case against the LADA's Office, within days of the Superior Court's denial of TMS's request,

TMS sought nearly the exact same relief from the United States District Court in BILLER v. LADA's Office.) This chronology of events illustrates, and in part comprises, Defendants' pattern and practice of conspiring to conceal and withhold evidence known by BILLER.

75.   Defendants are in the process of concealing relevant information, ESI, and documents that BILLER properly subpoenaed in BILLER v. LADA's Office.  BILLER sought relevant and material information, documents, ESI, and other evidence from Defendants, but they refused to produce the information, documents, ESI, and evidence.  Based upon his previous experience with Defendants, BILLER believes that Defendants have destroyed and/or are concealing and withholding the information, documents, ESI, and other evidence sought by the subpoenas.  Furthermore, based upon his experience while working at TMS, BILLER believes that Defendants are, again, failing to fulfill their legal obligations under the E-discovery rules and Federal

<u>Rules of Civil Procedure</u>.  BILLER asked Counsel for TMS (Fermin Llaguno, Esq., of the law firm Littler Mendelson, P.C.) if TMS destroyed, or concealed, the information, documents, ESI, and other evidence that BILLER created, stored, received and sent while he worked at TMS and that he now seeks.  Mr. Llaguno stated he did not know.  Under the Federal Rules of Civil Procedure and the <u>Zubulake</u> decisions, it is Counsel's legal obligation to know the answer to this very simple question.  BILLER has been attempting to obtain this evidence since November 2008, so TMS's Counsel's answer suggests Defendants have in fact destroyed the evidence.  Consequently, Defendants are not fulfilling their legal obligations under the E-discovery rules/laws in at least the following ways: TMS is not allowing outside counsel to (a) interview key players; (b) issue adequate and timely notices for litigation hold; and (c) conduct proper searches, collect, preserve, review, and produce information, documents, ESI, and other evidence.  In other words,

Defendants are continuing to engage in the same pattern and practice of conspiring to conceal, withhold, and destroy evidence, and violate E-discovery laws, that Defendants committed when BILLER worked for TMS and that he attempted to stop. Defendants' conspiracy has injured, and continues to injure, Plaintiffs.

## FIRST CLAIM FOR RELIEF

### FOR DECLARATORY AND INJUNCTIVE RELIEF

### 18 U.S.C. Sec. 1964 ("Civil RICO")

### (By Plaintiffs Against All Defendants)

76.   The previous allegations of this Complaint are incorporated by reference as if fully set forth here.

77.   By the above-alleged acts, Defendants, and each of them, injured, and continue to injure, Plaintiffs BILLER and LDT CONSULTING in their business or property, in violation of 18 U.S.C. Sec. 1964(c), which provides, in relevant part, that "[a]ny person injured in his business or property by reason of a

violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . ."

78.   18 U.S.C. Sec. 1961(1)(B) defines "racketeering activity" as, <u>inter alia</u> "any act which is indictable under any of the following provisions of title 18, United States Code:"

(a)   "section 1341 (relating to mail fraud)";

(b)   "section 1343 (relating to wire fraud)";

(c)   "section 1503 (relating to obstruction of justice)";

(d)   "section 1512 (relating to tampering with a witness, victim, or an informant)";

(e)   "section 1513 (relating to retaliating against a witness, victim, or an informant)";

(f)   "section 1951 (relating to interference with commerce, robbery, or extortion)"; and

(g)   "section 1952 (relating to racketeering)".

79.   Each Defendant is a "person" as defined by 18 U.S.C. Sec. 1961(3).

80.   Defendants constitute an "enterprise" within the meaning of 18 U.S.C. Sec. 1961(4).

81.   Defendants acts, as alleged above-herein, constitute a "pattern of racketeering activity" to conceal, withhold, and destroy relevant evidence and materials in their possession, custody, and control, within the meaning of 18 U.S.C. Sec. 1961(5).

81.   As alleged above-herein, Defendants, and each of them, are persons who comprise an enterprise which, through a pattern of racketeering activity, systematically conceals, withholds, and destroys evidence and information in litigation and related matters, and obstructs justice in violation of 18 U.S.C. Sec. 1503.   Defendants, and each of them, do so, in part, through the commission of mail and wire fraud in violation of 18 U.S.C. Secs. 1341 and 1343.

82.   As alleged above-herein, Defendants, and each of them, are persons who comprise an enterprise

which, through a pattern of racketeering activity, conspire to conceal, withhold, and destroy evidence and information in litigation and related matters.

83. Defendants, and each of them, have received, and continue to receive, income derived from the pattern of racketeering activity, as alleged above-herein, used and invested, and continue to use and invest, portions of such income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of an enterprise which is engaged in, or the activities of which affect, interstate and foreign commerce, all in violation of 18 U.S.C. Sec. 1962(a).

84. Defendants, and each of them, through a pattern of racketeering activity, as alleged above-herein, have acquired or maintained, and continue to acquire and maintain, an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate and foreign commerce, all in violation of 18 U.S.C. Sec. 1962(b).

85.    Defendants, and each of them, are employed by, associated with, and comprise, an enterprise engaged in, or the activities of which affect, interstate and foreign commerce, and conduct or participate in the conduct of that enterprise's affairs through a pattern of racketeering activity, as alleged above-herein, all in violation of 18 U.S.C. Sec. 1962(c).

86.    Defendants, and each of them, have conspired, and continue to conspire, to violate the provisions of 18 U.S.C. Secs. (a), (b), and (c).

87.    Accordingly, Plaintiffs seek relief under 18 U.S.C. Sec. 1964(a), which provides in relevant part that "[t]he district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to . . . imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same

type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce . . ."

88. More specifically, Plaintiffs seek an injunction enjoining Defendants, and each of them, from enforcing the terms of the Severance Agreement against Plaintiffs on the ground that it is part of and/or furthers Defendants' pattern of racketeering activity to violate the above-quoted sections of Title 18 of the United States Code, and has injured Plaintiffs in their business or property.

89. Plaintiffs' request for an injunction is based upon, inter alia, the following:

a. The above-alleged actions of Defendants, and each of them, were committed and undertaken in furtherance of Defendants' conspiracy to injure Plaintiffs' business and property rights by, among other things: (i) compelling BILLER to resign from TMS; (ii) taking actions to compel BILLER's silence regarding the crimes committed by Defendants and the

information possessed by Defendants; (iii) coercing
BILLER to enter into and execute a Severance Agreement;
(iv) preventing Plaintiffs' operation of LDT
CONSULTING; (v) preventing BILLER from engaging in the
practice of law and pursuing gainful employment; and
(vi) preventing and hindering the efforts of BILLER to
redress his grievances against Defendants and other
persons or entities.  In summary, as alleged more fully
above-herein, Defendants have committed, and continue
to commit, the following acts in furtherance of their
conspiracy:  (i) filing the declarations of Katz and
McKenzie that intentionally omitted material facts in
order to obtain a TRO and shut down LDT CONSULTING;
(ii) intimidating BILLER by warning him that if he says
anything, even truthful, non-confidential or privileged
statements, about his work history with TMS, TMS will
seek $250,000.00 in liquidated damages; (iii)
intentionally misconstruing and using the
Confidentiality Clause contained in the Severance
Agreement as a "sword" to compel BILLER's silence; (iv)

forcibly compelling the closure of LDT CONSULTING by filing misleading and fraudulent declarations and evidence; (v) destroying and/or concealing the signature page of The 23-Page Memo; (vi) interfering with BILLER's attempt to assert his rights in <u>BILLER v. LADA's Office</u>; and (vii) retaliating against and intimidating BILLER by seeking criminal contempt charges against him in <u>TMS v. BILLER</u>.

b.   The Severance Agreement is being used by Defendants in furtherance of their conspiracy, and actual pattern of racketeering activity, to conceal, withhold, and destroy evidence and information, obstruct justice, and deceive the judicial system, litigants, the Federal Department of Transportation's National Highway Traffic Safety Administration, and the public at-large, as alleged above-herein.

90.   Further, Plaintiffs seek a declaration that the Severance Agreement is unenforceable for at least the above-alleged reasons, pursuant to 18 U.S.C. Sec. 1964(a) and 28 U.S.C. Sec. 2201(a), the latter of

which states in relevant part that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

## SECOND CLAIM FOR RELIEF

## FOR CONSTRUCTIVE WRONGFUL DISCHARGE

### (By BILLER Against TMS)

91.    The previous allegations of this Complaint are incorporated by reference as if fully set forth here.

92.    From April 15, 2003 to September 17, 2007, BILLER was employed by TMS as in-house counsel in the position of its National Managing Counsel in charge of the National Rollover Program.  Beginning in or about May 2007, BILLER was informed by Defendants and their agents, managers, and officers, including, but not

limited to, Eric Taira, Alicia McAndrews, and Dian Ogilvie, that he must comply with Defendants' demands that he withhold from production and discovery in ongoing and future litigation, evidence, materials, documents, E-discovery, and ESI which were relevant, discoverable, and, in some cases, ordered produced. BILLER and Defendants had ethical and legal obligations to preserve and produce the evidence and materials BILLER was ordered by Defendants to conceal and withhold in violation of Rule 5-220 of the California Rules of Professional Responsibility which states that "a lawyer shall not suppress evidence that the lawyer or the lawyer's client has an obligation to reveal." BILLER refused to wrongfully conceal and withhold the evidence and materials in violation of his ethical and legal obligations.

93.    In doing the acts alleged above-herein, Defendants knew that concealing and withholding evidence and materials, and ordering BILLER to conceal and withhold evidence and materials, that they

ethically and legally were required to disclose and produce, required BILLER to choose between violating the law and resigning from his position as in-house counsel and an employee of TMS. Notwithstanding this knowledge, Defendants despicably subjected BILLER to cruel and unjust hardship in conscious disregard of his rights by insisting that BILLER violate the law and coercing him to resign from his employment when he refused to do so. This oppressive conduct was committed by Defendants, and each of them. Defendants' conduct warrants the assessment of punitive damages.

94.   As a proximate result of BILLER's refusal to acquiesce in Defendants' illegal activity and conspiracy to commit illegal acts, and in violation of public policy, Defendants harassed, intimidated, and threatened to terminate BILLER's employment, and as a result of this treatment, BILLER reasonably concluded that the conditions of employment were intolerable, and was compelled to resign on September 17, 2007.

95.   At all times relevant hereto, TMS deliberately created the working conditions that led and compelled BILLER to resign.  The knowledge of Defendants is based, in part, on the knowledge of, among others, TAIRA, McANDREWS, and OGILVIE, in their capacities as officers, managers, or supervisory employees.

96.   As a proximate result of Defendants' conduct, plaintiff has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish/physical impairment to his brain, and continues to suffer lost earnings and other employment benefits, all to BILLER's general and special damages in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**

**FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(By BILLER and J. BILLER Against All Defendants)**

97.   The previous allegations of this Complaint are incorporated by reference as if fully set forth

here.

98. The above-alleged actions of Defendants, and each of them, were extreme and outrageous. Specifically, Defendants, and each of them, through the extreme and outrageous actions and conduct following BILLER's departure from TMS on September 17, 2007, as alleged above-herein, intended to cause, or recklessly disregarded the probability of causing, severe emotional distress, physical impairment to his brain, and Post Traumatic Stress Disorder to BILLER.

99. BILLER suffered severe or extreme emotional distress and physical impairment of his brain, as alleged above-herein, including, but not limited to, sustaining Major Depressive Disorder and Post Traumatic Stress Disorder, as an actual and proximate result of Defendants' intentional, malicious, extreme and outrageous conduct, all to BILLER's general and special damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for Judgment, as follows:

**ON THE FIRST CLAIM FOR RELIEF:**

1.    An injunction enjoining Defendants, and each of them, from enforcing the terms of the Severance Agreement against Plaintiffs on the ground that it is part of and/or furthers Defendants' pattern of racketeering activity to violate Title 18 of the United States Code;

2.    An injunction prohibiting Defendants from conspiring to conceal and withhold relevant evidence in, without limitation, TOYOTA MOTOR SALES, U.S.A., INC. v. DIMITRIOS P. BILLER (Los Angeles Superior Court Case No. SC 100501), any arbitration and related proceedings involving Plaintiffs, and in any other matter;

3.    A declaration that Defendants, and each of them, are persons who comprise an enterprise that has

conspired, and continues to conspire to, and actually engage in a pattern of racketeering activity to conceal, withhold, and destroy evidence and materials, obstruct justice, and commit other predicate acts enumerated in 18 U.S.C. Sec. 1962(1), all of which has injured and continues to injure Plaintiffs;

4.   A declaration ordering, adjudging, and decreeing that the Severance Agreement is void and unenforceable as against public policy and interests; and

5.   For all damages caused by Defendants' violations of 18 U.S.C. Sec. 1962, including treble damages.

**ON THE SECOND CLAIM FOR RELIEF:**

1.   For general damages for constructive wrongful discharge according to proof;

2.   For medical and related expenses and/or other special damages according to proof; and

3. For back and front lost wages according to proof.

**ON THE THIRD CLAIM FOR RELIEF:**

1. For general damages for severe emotional distress, physical impairment to BILLER's brain, and mental suffering according to proof;

2. For medical and related expenses according to proof; and

3. For lost wages according to proof.

\\\

\\\

\\\

\\\

\\\

\\\

\\\

**ON ALL CLAIMS FOR RELIEF:**

1. For reasonable attorney's fees incurred by Plaintiffs in obtaining the benefits dues them;

2. For costs of suit herein incurred;

3. For exemplary and punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct; and

4. For such other and further relief as the court may deem just and proper.

Plaintiffs demand a jury trial.

Dated:   July 24, 2009          ALLEN + WOHRLE, LLP
                                JOSEPH P. WOHRLE
                                JEFFREY F. ALLEN

                                DIMITRIOS P. BILLER

                                _____
                                Dimitrios P. Biller
                                Plaintiff and Counsel for
                                Plaintiffs

**EXHIBIT "1"**

This memo is written to attach to my 2007 Performance Appraisal. I have given a copy to Eric Taira, Vice President & Assistant General Counsel for the PL Group in the Legal Services Department, and I requested that he sign it after reviewing it. I have requested that it be attached to my 2007 Appraisal.

The purpose of this memo is to obtain a more constructive Appraisal and to explain the background of the 2007 Appraisal. Some of the criticisms in the 2007 Appraisal were made in 2006. I specifically addressed those 2006 criticisms over the course of 2006 and supplied Eric Taira with a memo setting forth facts showing substantial improvement. However, those facts were ignored in the 2007 Appraisal.

I have set forth Eric Taira's comments in Sections I – VI of the 2007 Appraisal in bold print, and my views following the bold in each section. I believe Eric Taira's criticisms below are retaliatory in nature because (a) I have been critical and outspoken about Toyota's position on E-Discovery issues, (b) I have insisted that TMC follow the law and Eric Taira thinks I have been to insistent, (c) I have informed Eric Taira that I will have to go to upper level management if the situation does not change, and (d) I informed Eric Taira last year in my Self Assessment that the PL Group has become a dysfunctional work situation. The issue of retaliation will be discussed below in Section VII.

## I.    Teamwork and Communication.

**"Mr. Biller is encouraged to promote teamwork and communication with his fellow associates, our Japan staff, our outside counsel and TMC staff by seeking all opinions/perspectives of others, with a view towards reaching consensus decisions."**

### A.    Communication.

This criticism is unjustified and has no basis in reality. First, there are not any specific examples to substantiate this statement.

Second, there is not another associate in the PL Group who communicated more than me on legal issues in an effort to keep everybody informed and to make intelligent decisions based on the facts and the law. I was able to get consensus on how 21 cases should be resolved in the calendar year 2006 and three of those cases went to trial. In other words, there are 21 specific situations in which I was able to communicate with TMC and get consensus on how to resolve cases.

Third, I spent countless hours communicating with fellow associates, outside counsel, TMC and the Japan Staff in an effort to establish "consensus" on important legal issues. I constantly communicated via e-mail with outside counsel, TMC staff, Japan Staff, and fellow associates to keep everybody informed on relevant and important issues. I drafted exhaustive memos related to PL Group meetings, video-conferences with TMC, meetings with associates at TMA-DC and TEMA, outside seminars, trial reports, and any significant matter. I have prepared power point presentations for outside counsel and TMC in an effort to get consensus. This communication was done for the specific

1

purpose of informing all interested parties of relevant issues related to decisions that needed to be made (i.e., consensus) and to improve the legal position of Toyota. For example:

1. I made an in person power point presentation at Hartline Dacus on June 20, 2006 to explain how that firm was not properly representing Toyota and explaining how to improve that representation;

2. I prepared numerous memos to attorneys at Hartline Dacus to teach them how to properly prepare cases for resolution and to educate those attorneys on the "processes" that must be followed;

3. I visited Hartline Dacus on a second occasion to discuss poor performance issues and to teach attorneys how to properly evaluate cases.

4. I drafted a comprehensive Engagement Letter setting forth Toyota's reasonable expectations of its outside counsel to improve that representation and to reduce legal expenses and settlement figures;

5. I prepared the Credible Trial Threat power point presentation at the Outside Counsel Seminar outlining the cornerstone of Toyota's litigation management philosophy;

6. I prepared numerous memos and e-mails to Eric Taira, all Managing Counsel, Japan Staff and TMC related to E-Discovery issues to inform all interested parties of those issues and to protect Toyota;

7. I prepared memos following discovery and investigations related to E-Discovery investigations at TMA-DC and TEMA to keep all interested parties informed;

8. I prepared presentations for the E-Discovery Submit to give all interested parties the benefit of discovery and investigations conducted related to E-Discovery;

9. I prepared memos on adopted processes and procedures related to E-Discovery so all Managing Counsel knew those processes and procedures (process of issuing Notices for Litigation Hold & Process of conducting searches, collections and review of electronically stored information ("ESI");

10. I have sought the timely advise of outside counsel on numerous legal issues to provide TMC, the Japan Staff and all Managing Counsel/Eric Taira with the benefit of the law before discussions are made: (a) Joe Valentine's memo on searching, collecting, reviewing and producing ESI; (b) Bowman & Brooke's opinion letter on when to issue a Notice for Litigation Hold for the 4th generation 4Runner; (c) Joe Valentine's opinion letter related to the non-discoverability of the data base used to review the ESI collected from TMA-DC: (d) numerous memos from Bowman & Brooke related to obtaining the most restrictive Non-

Sharing Protective Order and obtaining copyright protection over the "Books of Knowledge" and TRIM; (e) memos regarding the discoverability of ESI recently discovered;

11. I routinely provide TMC with the most complete Case Summary Reports and Executive Summaries at least 45 days before mediations and trials to reach consensus on how cases should be resolved.

I have assembled all of these communications to substantiate the high level of my communication. Those notebooks of written communication are available.

I have also regularly communicated with all interested parties in person during National Rollover meetings, conferences with TMC and the Japan Staff related to E-Discovery issues at TEMA and TMA-DC, and at TMS. I conducted Engineering Evaluation Conferences with outside counsel and Toyota's experts to monitor the development of cases. I actively participate in meetings on Litigation Testing and I was the person responsible for forming the 6 sections in Litigation Testing Proposals that need to be analyzed for any test (Test, Purpose, Risks, Costs, Point to be proven, and Changes the Risks will Materialize).

Furthermore, Eric Taira has meetings related to my relationship outside counsel because a I am very tenacious and critical of their work performance and representation of outside counsel. Many of the lawyers I supervise were hired by Eric Taira and he is much more loyal to them than me. I don't have any such conflict of interests, so I'm very upfront with my criticisms and I have very high expectations on how cases are evaluated and prepared. Eric Taira has never told me anything about his communications with outside counsel, but they have informed be about some of their discussions. It is simply unfair for Eric Taira to "judge" me on communication with outside counsel without giving me a fair opportunity to discuss the issues with him and to give him my point of view. I told Eric Taria last year:

## "E. Due Process.

I have been advised that certain outside counsel are allegedly "afraid" that I may not use their services and I have been unreasonably demanding. However, when I was informed of these "vague" and "ambiguous" accusations, I was not told of the specific nature of the complaints, the circumstances in which outside counsel became "afraid" and I was led to believe that Karl Viehman and Kurt Kern are two of the outside counsel making these statements. It is simply unfair to approach me with vague/ambiguous accusations without giving me "fair notice" and an "opportunity" to address the concerns by putting everything in the proper contexts. When I talked to Karl Viehman and Kurt Kern about my management style, they both told me that they were not offended in any manner about how I approach them and the management of cases they work on with me. Karl Viehman stated that he took my criticisms of his work "personally" the first couple of times, but then realized my criticisms were not "personal" but designed to protect the interests of Toyota. Kurt Kern specifically told me that he does not have any criticisms of my

management style and the results speak for themselves. I have asked both Karl Viehman and Kurt Kern to tell me how I can be a better managing counsel and they both told me that I should not change because my approach is working. They both told me that they would tell me if they had any criticism or if they were offended, but they did not and have not. If criticisms are going to be launched from outside counsel through in-house management, then I should be given "notice" by being told (a) who is making the criticisms, (b) the facts/circumstances of the underlying incident that caused outside counsel to launch the criticism, (c) what outside counsel has specifically said, (d) the response to outside counsel's comments, and (e) an opportunity to address both the criticisms and the underlying incident before there is the formulation of any judgment on my management.

Clearly, my criticisms of Kurt Kern and Karl Viehman arose in the contexts of specific cases that they improperly handled and that either cost Toyota millions of dollars or potentially cost the company millions of dollars. The Mower settlement of over $3 million resulted from poor case development and case evaluation by Karl Viehman and Hartline Dacus; the Cantu case was improperly prepared and could have resulted in a settlement of $2.5 to $3 million, but was resolved for $1 million when I insisted on the development of new evidence; Espinosa was improperly prepared and resulted in an excessive settlement; Soto was neglected until I had to discharge the incompetent associate on the case, then we settled it for $250,000; Garza/Sturm was improperly prepared until I asked Kurt Kern to get Pryce Tucker off the case because of his inadequate work performance, then the case was properly prepared to get a defense verdict. I voice my criticisms, and praise, under the appropriate circumstance to fully protect the interests of Toyota. If I'm going to be criticize for this approach, then those criticisms should be specific and not built on a house of hearsay cards because my reputation and career are at stake.

## A. Jim Halbrooks.

I specifically stated last year that Jim Halbrooks was going to harm my reputation with experts and/or other outside counsel in an effort to promote his own personal interests and/or to protect himself because I was critical of his work performance. Jim Halbrooks wanted to somehow make himself indispensable by means other than his work performance. Jim Halbrooks' May 4, 2005 e-mail to Doug Bishop regarding Don Tandy supports my conclusion and prediction. Jim Halbrooks wrote:

"I am sending this just to you. My counsel to you is to spend more time on items one and not item two. Don was close to dumping Toyota in Nov but we chatted and he hung in there. He is once again thinking about dumping Toyota because he feels he is being nationally defamed by your colleague. I counsel you to make it more, substantially more of a peach conference and fence mending trip than a trip to prep him about Toyota. Travel safe."

As confirmed by David Graves, Chris Spencer, Vince Galvin, Kurt Kern, Doug Bishop and Jim Halbrooks (through his silence) at the July 19, 2005 Rollover Quarterly Meeting,

4

80

Don Tandy has NEVER threatened to "dump" Toyota. I specifically asked everybody at that meeting if Don Tandy has ever stated, suggested or implied that he was thinking about "dumping" Toyota. Everybody said "no." Jim Halbrooks did not say "yes" during that meeting. Instead, everybody stated that Don Tandy valued his relationship with Toyota and he wanted to make it better by improving his trial testifying skills and preparation efforts. Furthermore, Doug Bishop and Chris Spencer independently met with Don Tandy while I was attending the Kurylowicz trial in May 2005, Doug Bishop distributed a memo regarding that meeting and his memo did not confirm Jim Halbrooks' statement. I had a pleasant dinner with Don Tandy before the second day of his testimony in Ramos-Guajardo (March 2005) in which we exchanged a lot of thoughts and "bonded", but he never told me he was thinking about "dumping" Toyota or that I had "nationally defamed" him. By November 2004, I did not formulated any specific opinions about Don Tandy's skills as an expert on handling/stability issues because I never saw him testify on those topics, Don Tandy gave average accident reconstruction opinions in Perry (September 2004) and Bracho went to trial in very late November 2004/December 2004, so there was not any reason for Don Tandy to "dump" Toyota in November 2004. Jim Halbrooks' statement to Doug Bishop ("Don was close to dumping Toyota in Nov but we chatted and he hung in there. He is once again thinking about dumping Toyota because he feels he is being nationally defamed by your colleague.") is simply false and a down right lie purely designed to make it appear as if Jim Halbrooks plays a meaningful role in the Program. I have NEVER "nationally defamed" Don Tandy; he never thought about "dumping" Toyota – let alone "dumping" Toyota because of me.

An attorney's reputation is probably one of the most important legal and professional assets. Jim Halbrooks has been allowed to tarnish my reputation. In the process, he has exposed Toyota to harms way because I am a "representative" of Toyota. Yet, Jim Halbrooks was not confronted about his slanderous, libelous, and false representations (as far as I know); he has not been reprimanded; he has not been asked to take responsibility for his conduct, apologize and make amends. Furthermore, I was required not to say or do anything to defend my "reputation" as Jim Halbrooks continued to be invited to meetings that involved the exchange of sensitive and privileged information that could harm my reputation and the interests of Toyota, if Jim Halbrooks decided to repeat comments made at those confidential meetings out of context. It is simply impossible for me to understand the logic and reasoning behind the decision to allow Jim Halbrooks to attend the Rollover Meetings when sensitive information and ideas are being exchanged and Jim Halbrooks can not be trusted to (a) not repeat any sensitive information and (b) he has proven himself to be dishonest. Why should my speech be chilled during the Rollover meetings in fear of Jim Halbrooks? Why should the "morale" of Jim Halbrooks be placed over my morale? There is a logical disconnect between the justification of inviting Jim Halbrooks to the Rollover meetings (maintain and/or improve his work performance by not destroying his morale) and reality. Jim already knows he is not a meaningful member of the National Rollover Program; I have taken him off of very rollover case under my management. Jim Halbrooks is not the same attorney and he is suffering from severe personal and professional problems. Inviting Jim Halbrooks to the Rollover meetings will not improve his morale, and his work performance will not

improve even if his morale is improved through an invitation. The "justification" for inviting Jim Halbrooks to these meetings is pregnant with unreasonable and unrealistic assumptions.

There is a double standard at work. When Vince Galvin left a National Rollover Quarterly Meeting in August 2005, I was instructed to tell Vince Galvin that he should not leave any such meetings early and if he could not attend the full meeting, then he should not attend at all. However, when Jim Halbrooks decided to leave the December 2005 meeting early before it was completed, I was not instructed to talk to Jim Halbrooks and his conduct was simply overlooked. Did anybody talk to Jim?

Furthermore, TMS wants Managing Counsel to establish "co-counsel" philosophy of management with outside counsel that is built on "mutual trust", but this situation with Jim Halbrooks, how my views have been received, and the preference Jim Halbrooks gets over me (and other counsel) are not promoting "mutual trust"; instead, there is a destruction of "mutual trust."

Again, it is my strong recommendation and sincere request that Jim Halbrooks not be invited to any National Rollover meeting in 2006.

## B. Jim Halbrooks.

Additionally, I have serious concerns about outside counsel who have continuously performed poorly to jeopardize Toyota's interests and who engaged in certain behavior that may be interpreted as "ethical misconduct." Jim Halbrooks is a problem. I hoped talking to Jim would cause him to perform at a higher level, but it has not worked. Jim's conduct over the last year proves to me that he will not improve because he has serious personal and professional problems that need to be resolved. Unless he resolves those problems, his performance will continue to be poor.

Jim simply took advantage of his relationship with Toyota for his own personal desires. He invited himself and Robin Guise to the Texas Rollover Quarterly Meeting in December 2003 without my permission; he "required" Robin Guise to be his "personal" paralegal during the Kephart trial in Stockton, California for nearly four months even though David Graves told him to use a paralegal in the San Jose office; he instructed Robin Guise to do "busy work" on cases that was not necessary, was wasteful, was not authorized and simply allowed Robin Guise to bill unnecessary hours to Toyota cases (time on Narjano reviewing deposition transcripts); he engaged in unprofessional conduct during the Kephart trial with lead trial counsel when David Graves excused Robin Guise; he attempted to "cover-up" these acts by lying to me. Jim falsely told me that (a) I gave him permission to attend the Texas Rollover Quarterly Meeting with Robin Guise, (b) Bowman & Brooke did not have another paralegal in San Jose to attend the Kephart trial so Robin "had" to attend, (c) I told him he would be lead trial counsel in Narjano, so his paralegal had to get caught up to speed on the case, (d) he and David Graves got into an argument because David Graves excused Alan Dorris from the Kephart trial without talking to Jim and (e) Jim told me his poor performance is due to his "career" crisis

because he wants to be a "lead trial attorney" and not because Robin Guise left Bowman & Brooke after David Graves took her off the Toyota Team.

Jim has also performed poorly in representing Toyota. The National Rollover Program specifies his duties/responsibility. He has repeatedly failed to fulfill his obligations. I have talked to Jim repeatedly about his duties and his failures, but he has not improved. Jim and I had discussions in August 2004 while in Japan, September 2004 while in Dallas, Texas during the Perry trial, November 2004 in Torrance, California and December 2004 in Houston, Texas during the Bracho trial. Jim failed to submit properly prepared Case Summary Reports in a timely manner and to have cases prepared in sufficient time to submit complete Case Summary Reports (The CSRs in Hunsberger, Butterfield, Paz, Ramos-Guajardo, and Donne Miller submitted between October 2004 and December 2004 were deficient); Jim failed to have experts properly prepared for Legal Engineering Conferences; Jim did not have the Ramos-Guajardo LEC on his calendar and would have missed that LEC if I did not remind him of the LEC the day before the LEC; Jim did not make sure Lee Carr attended the Cantu LEC after I specifically instructed Jim one week before the LEC to talk to all the experts, I reminded Jim 5 days before the LEC to talk to all the experts and Jim was actually at Lee Carr Engineering for the two days immediately before the LEC but he failed to talk to Lee Carr and Lee Carr to not appear at the Cantu LEC; Jim did not adequately prepare Mr. Yonekawa on the recall issues in Hunsberger when I specifically requested him to cover those issues and the case involves a recalled 4Runner; Jim failed to prepare Don Tandy in the Bracho trial on accident reconstruction issues after I specifically instructed Jim to get Don prepared; Jim does not take responsibility for his failures and he almost always blames his mistakes on "circumstances." Luke Torres and Alicia McAndrews have experienced similar shortcomings with Jim.

This sort of behavior verges on legal malpractice. This behavior is a sign of a professional who has lost touch with reality and does not have the interests of his clients at heart. Jim is out of control. He has been out of control for a long time. He has put his personal interests ahead of his clients' interests for a long time. I'm in charge of "managing" Jim, but he is not responding. I'm concerned that I will be criticized for not changing Jim or getting him to stop committing acts that verge on malpractice. I'm concerned that if Jim's conduct will expose my legal position. I'm concerned that I will be blamed for his conduct. I'm concerned that TMS will change its internal procedures. I'm concerned because Jim has provided Toyota legal services for a long time. I'm concerned that Jim will attempt to damage my reputation with other outside counsel/experts to protect his reputation and interests. I'm concerned about the approach TMS wants to pursue with Jim because (a) it will not work and (b) he will harm Toyota and/or me in the process. I simply have worked too hard in my professional career and during the two years at TMS to have someone like Jim Halbrooke harm my clients and/or me. Jim's poor performance simply makes my job more difficult. I have to do the things that Jim does not do.

Jim claims he wants to be a "lead trial" attorney and handle the day-to-day aspects of cases. He is dissatisfied with his role of "National Counsel" in the Rollover Program.



Jim simply does not have the skills to be a lead trial counsel because he lacks attention to detail on many levels. If Jim is dissatisfied with his role, he will not improve because he will not have any enthusiasm for this role. He will grow to resent his role. He will grow to resent those people he views as responsible for not giving him opportunities as lead trial counsel.

I understand Don Marshall has met with Jim to discuss his performance. As a result of that meeting, Jim approached me on February 16, 2005 to discuss his performance. Jim told me that it is "very important to me (Jim) that we (Jim and me) get alone because I respect you and I like you." Jim had difficulty articulating anything beyond this message because he was getting emotional. Jim is obviously suffering because his personal and professional worlds are in turmoil. I told Jim that he needed to take responsibility for his mistakes to (a) avoid mistakes in the future, (b) so we can find the consequences of his mistakes and (c) so everybody could move beyond the mistakes to focus on the bigger picture. I explain it is very important to me that people take responsibility for their mistakes and he simply has failed to do so. Instead, he comes up with stupid excuses that are insulting. He agreed, but tried to give excuses for his mistakes. I further told Jim that I wasn't necessarily upset about the mistakes he was making; instead, I was upset because he was not putting in 100% effort to avoid mistakes and to make sure Toyota's interests were fully protected. I explained that mistakes are going to happen, but as long as he was making 100% effort then we could deal with the mistakes. I simply can't accept mistakes that are made as a result of an effort that is less than 100%. I told Jim that I wanted us to get alone and to have a better working relationship, but he had to (a) put in 100% effort and (b) he had to take responsibility for his mistakes. The meeting was short and it was somewhat disappointing because Jim tried to feed me ridiculous excuses for some of his recent mistakes and he wasn't truthful about how those mistakes occurred. Jim still has a "propensity" to spin history to make Jim look good or not bad."

It is unfortunate, and it should be unacceptable, that Eric Taira will show more loyalty and "trust" in outside counsel than Managing Counsel. There is an inherent conflict of interests between outside counsel and Toyota; the more work outside counsel performs on cases, the more money outside counsel generates. I do not have that conflict of interests and my loyalty and interests are for Toyota and its associates – not outside counsel.

## B.   Teamwork.

The second aspect of the above criticism is an empty statement. Again, there are not any specific examples to substantiate this erroneous comment. In reality, I have worked hard to become more of a "team player" by allowing others to take control of situations like Eric Taira requested.

I have taken a "back seat" to everybody at the National Rollover meetings. Eric Taira wanted to control all those meetings and he was not interested in hearing any point of view that was inconsistent with his agenda. I only spoke up when proposals were being made that were in violation of the law or fraudulent in nature because the TMS Ethics

8



Policy, and my duties as a licensed attorney, prohibit me from supporting any such proposals.

For almost 2 years, I have remained silent at Eric Taira's request about TMC's failure to follow the law and properly conduct discovery investigations, and to properly produce ESI in response to E-Discovery; he repeatedly instructed me to "let TMC come along" and "take ownership" with regard to E-Discovery and "not to push TMC until TMC is ready to act." I displayed the patience of a Saint in the name of "Teamwork."

There have been some occasions when I refused to agree to certain courses of action because the action or inaction was in violation of the law. For example:

1. I insisted that TMC produce ESI collected in the <u>Green</u> litigation because not to do so would violate TMC's discovery obligations and I did not agree to bury the ESI;

2. I insisted that I be allowed to interview TEMA associates to gather facts necessary to obtain the most restrictive Non-Sharing Protective Order because (a) TMC, TMS and TEMA agreed, (b) Dan Fuchs requested the help, (c) TMS has historically conducted such investigations, (d) TMS is contractually and legally obligated to provide such assistance and legal counsel, (e) TMS owns its ultimate legal duty of care to the Shareholders of TMC, not TMC Legal, and (f) TMS has the same legal obligations to TEMA and TMC, so TMC Legal does not have the authority to prohibit TMS from providing legal services to TEMA – especially to prevent TMS from learning important facts.

3. I did not agree to TMC's "process" of when to issue Notices for Litigation Holds in every case because that would create gaps of ESI that would not be preserved and would be destroyed, and it was inconsistent with the "process" that was point in place 2 years ago, so TMC would be exposing itself to allegations that it destroyed evidence and possible sanctions.

## C. There is an Unhealthy Work Environment that Undermines Communication and Teamwork.

Eric Taira has created a work environment that is dysfunctional, subject to deception, and dominated by either insufficient communication or intentional miscommunication without even attempting to obtain consensus from Managing Counsel and Toyota's outside counsel. Eric Taira's idea of establishing consensus is agreeing to everything TMC wants to do, and not persuading TMC to take a different course of action that TMC is legally obligated to follow. Additionally, he simply attempted to impose his will based on agreements or understandings he has form with TMC outside the presence of Managing Counsel and without the advice of outside counsel. Below are specific examples substantiating these observations.

9



First, on November 30, 2006 he instructed members of the National Rollover Committee and TMS Managing Counsel for the first time that TMS and TMC would start issuing Notices for Litigation Hold for each case and limit the scope to case specific documents, issues, and vehicles. But he did not inform anybody that TMC requested this process because TMC wanted to find opportunities to discard ESI Instead, he came up with an illegitimate reason for this new process that was totally inconsistent with the accepted protocol that was in effect for almost 2 years (to not confuse associates on what ESI needs to be preserved). Furthermore, he and TMC did not even obtain the legal advice of outside counsel regarding the negative impact this proposed scheme would have on Toyota in light of the ongoing practices – create evidence that Toyota discarded potentially relevant evidence.

Second, Eric Taira yelled and screamed at National Rollover Counsel, David Graves, (when he really was yelling and screaming at me in the same meeting) in the March 2007 Rollover meeting about counsel and I not "thinking through" the consequences of creating a data base with Summation to review ESI collected at TMA-DC. Eric Taira stated that the data base was now discoverable and we exposed Toyota to a bad situation. Eric Taira was simply out of line and unnecessarily attacked us because he thought he & TMC were not informed of how the review was going to take place. However, Joe Valentine prepared an opinion letter at my request in January 2007 that essentially gave us the legal opinion that a search engine and data base was appropriate to review ESI. I e-mailed that opinion letter to Eric Taira and TMC in January 2007 before there was any search and collection of ESI at TMA-DC in February 2007 and before the review process started in March 2007. Eric Taira simply did not read the letter or he forgot the opinions expressed in the letter.

Third, Eric Taira insisted that he was right about the Summation data base being "discoverable", but he would not explain the basis of that erroneous opinion, claimed he has read cases holding the data bases was discoverable, and insisted that I had created a data base that was discoverable. I was forced to get another opinion letter explaining that such a searchable data base was NOT discoverable and there was not a single case on the books that held such a data base to be discoverable.

Fourth, Eric Taira has destroyed my relationship with TMC by either sending my e-mails intended for his eyes only related to E-Discovery to TMC without my knowledge and without giving me an opportunity to present my ideas & criticisms to TMC. I have repeatedly requested that Eric Taira explain why he has undermined my relationship with TMC, but he refuses to discuss the issue. I have explained that his actions are inconsistent with the Toyota Way, and have interfered with my attorney-client relationship with TMC, but he refused to respond to my e-mails.

Fifth, Eric Taira holds separate meetings with the Japan Staff and TMC related to E-Discovery issues without seeking guidance, input and recommendations from Managing Counsel. He allegedly formed a TMS E-Discovery Team in 2005 or 2006 without asking me or any Managing Counsel how that team should help Managing Counsel with E-Discovery. He knew that I was recommending the formation of the E-Discovery Team

10

and I wanted to lead that team, but he intentionally did not inform me about its formation and did not seek my views on how it should be formed.

Sixth, Eric Taira has failed to inform Managing Counsel about significant evidence directly related to rollover litigation that Toyota must produce in litigation and that he failed to bring to the attention to Toyota's outside counsel in 2000 or 2001 (Yonekawa's power point presentation to NHTSA). He has allowed me to recommend and take to trial 6 4Runner rollover cases without this very relevant document being produced in litigation.

Seventh, although I have recommended that Brian Eyres be dismissed from the National Rollover Program, and no other Managing Counsel believes he provides any benefit and is not helpful, Eric Taira refuses to dismiss him from attending the meetings and Brian Eyres continues to charge Toyota $300 an hour to attend the meetings (including traveling to Los Angeles from Phoenix).

Eigth, Eric Taira unilaterally decided to settle the Green to avoid E-Discovery issues involving TEMA; when we sought authority from Dian Ogilvie to settle this case for $2 millions, he did not inform her about the real reasons for settling the case. I totally disagreed, but he disregarded my opinion.

Ninth, when TMC, TEMA/TTC, TMA-DC and TMS agreed at the E-Discovery Submit that I should interview witnesses at TEMA/TTC regarding the "Books of Knowledge", he unilaterally told me that interview could not go forward until Mr. Shibata of TMC agreed. When he agreed within a couple of days, Eric Taira then stated that it could not go forward until TMC, TMS and TEMA/TTC had an in person meeting at TEMA/TTC to discuss the interviews and to get an agreement for TEMA/TTC. When that meeting took place in February 2007, and an agreement was reached that I should conduct the interviews, TMC then informed me that TEMA/TTC should conduct the interviews, not me, and Eric Taira did not oppose TMC's instruction. Clearly, Eric Taira and TMC were working together outside my presence to prevent me from conducting interviews at TEMA/TTC. I learned in March 2007 from Ike Fukumoto that TMC did not want me to interview the witnesses because I learn too much everytime I visit TEMA/TTC. I was the person who discovered the "Books of Knowledge" at TTC in connection with the Sears litigation.

Tenth, Eric Taira unilaterally instructed me to settle the Sears case for an amount that was unreasonable to avoid producing ESI and the "Books of Knowledge" in that case. I totally disagreed, but he disregarded my opinion.

## II.   Leadership/Initiative.

**"He is encouraged to promote a work environment where all points of view are invited and considered."**

I don't understand how I have not encouraged "a work environment where all points of view are invited and considered." Again, there are not any specific examples supporting



this statement. All points of view were expressed on any and all legal issues that must be resolved. However, I did not agree to take any courses of action or inaction that would not follow the law, and I repeatedly encouraged Eric Taira and TMC to take certain course of action consistent with the law that Eric Taira and TMC did not want to take. The notebooks of memos and e-mail communication between me and Eric Taira/TMC over E-Discovery issues is proof of my efforts.

## III.    Strengths to Build On.

"A challenge for Mr. Biller will be allocating his time commitments among his litigation responsibilities and management responsibilities. He is encouraged to continue delegating responsibility for attending mediations and settlement conferences in appropriate cases to John Rodricks, National Claims Manager, and Carole Hargrave, Claims Manager."

This is the same "criticism" that Eric Taira made last year and this statement is completely irrelevant to the issue addressed in this section of the Performance Appraisal regarding "strengths to build on." Last year, Eric Taria wrote:

"Strengths To Build On: One way to balance that allocation of his time commitments is to continue delegating responsibility for attending mediations and settlement conferences in appropriate cases to John Rodricks, National Claims Manager, and Carole Hargrave, Claims Manager."

I told Eric Taira last year that his comments are not accurate and constructive. I explained last year:

"I have assigned John Rodricks and Carole Hargrave to attend mediations in my presence. Carole Hargrave attended the mediation in Woods, and John Rodricks attended the mediation in Kim, and Paniguara,. I have sought the recommendations of outside counsel to determine if my personal appearance at mediations is required to get the cases settled or will maximize the chances the cases will be settled. I attend those mediations when outside counsel recommended my attendance.

The above criticism does not address my "strengths", according to what I learned at the Great Manager's Program. My "strengths" include: "activator", "analytical", "strategic", "achiever" and "learner." In order to build on my "strengths", I need to be put in a work environment that will apply these strengths, so they will continue to grow and get stronger. These are the strengths that the Great Manager's Program identified. I have distributed literature to my supervisors on how to manage somebody with these strengths

In terms of case management, I have sought specific action to build these strengths. I have prepared and distributed my personal "Mission Statement", and prepared and sent a comprehensive Engagement letter to outside counsel."

12                                                                        88



The criticism above does not even address my strengths and Eric Taira refuses to acknowledge those strengths. I took the Great Manager's Program, on my own initiative and on the recommendation of Eric Taira. Furthermore, following the Great Manger's Program I had a meeting with Eric Taira to talk about my strengths and how we can work together to make me a more productive and efficient associate by giving me more assignments consistent with my strengths. Again, Eric Taira refused to talk to me about my strengths and wanted to focus on "non-strengths." But for Dian Ogilvie's efforts, I would not be in a position to apply my strengths.

## IV.    Areas for Improvement.

"At the same time, form a company internal perspective, Mr. Biller is encouraged to consider his role as a manager of company resources, including outside counsel fees, experts' fees and other case expenses. He is encouraged to develop his understanding of the company's operations and business units beyond the context of litigation, as a balance must be achieved in obtaining excellent litigation results while at the same time, managing limited financial and staffing company resources at TMS, TMC and the Toyota North American companies."

### A.    Managing Company Resources.

This is essentially the same criticism Eric Taira stated in 2006 related to "Areas for Improvement." However, the comments are not justified and ignore the specific action and steps that I have taken in 2006 to address these criticisms. Before my Performance Appraisal was completed for 2007, I informed Eric Taira the following:

"I have taken specific actions to better protect the company's resources. I have required outside counsel to calculate "reasonable settlement values" and "reasonable jury verdict ranges" with a specific formula that forces them to identify damages and all legal issues, and to explain the basis of their recommendations. This has forced outside counsel to take responsibility for seeking settlement authority and has proven to be a check resulting in lower settlements to protect the company's "financial interests." I attempt, and I am successful most of the time, to negotiate settlements will within my authority, or I do not seek authority above the minimum necessary to settle cases. I have limited my requests for corporate witnesses from TMC to 10 occasions and this has protected the company's "human resources." I have become very familiar with TMA and TTC through extensive investigations at those companies in Sears and Green. I have asked to get more involved in the e-discovery projects to become more familiar with the business operations of the various departments and groups at TMS. To some extent, I have done so by informing Group managers about the Notice for Litigation Hold in Witherow, participating in e-discovery training of the groups and departments receiving the Notice for Litigation Hold in that case, and interviewing many TTC associates at TTC in Gardena related to the Greenberg litigation. I have also voluntarily offered my time to assist other Managing Counsel with their work loads

13



when they have been called into trial and I was available at work to assist by covering corporate witness depositions and attending EECs. Although spending time away from home continues to jeopardize my personal life and family life, I have volunteered to attend trials for other Managing Counsel who have conflicts and can not attend trials for their own cases. This is a very big sacrifice because I spent 85 days away from home in 2006 (nearly 3 months and ¼ of the year).

I asked Dian Ogilvie to assign me to a committee that will expose me to TMS and its business operations, and that will allow me to use my 5 Signature Strength Themes. Dian nominated me to work on the em2 committee designed to improve TMS and dealership customer service. I am working on the em2 project in addition to my case management and e-discovery projects."

Furthermore, I am responsible for managing some of the most high exposure cases, I have taken cases to trial against "Repeat Offenders" to discourage them from filing more complaints against Toyota and I have taken more rollover cases to trial than anybody. I have done so to firmly establish the cornerstone of Toyota's litigation management philosophy ("Credible Trial Threat"). More resources are needed when cases go to trial because more time, money and human resources are needed for a longer period of time during the course of a case's life because the case does not settle.

Moreover, I have complained to Eric Taira that nobody in the Rollover Program is taking 4Runner cases to trial, so I have to manage my cases in such a way to get trial opportunities in an effort to maintain a strong "Credible Trial Threat" with the Plaintiffs' Bar. I informed Eric Taira in my 2006 Self Assessment:

### "D. A Failure to Get More Support for the Creation of a "Credible Trial Threat."

Although 2005 has been a very successful year in terms of creating a more "credible trial threat" in the rollover program and in Texas (the single biggest jurisdiction with the most cases), and the creation of a "credible trial threat" is one of the most important goals for our group, I do not think everybody involved in the Rollover Program has this vision clearly in mind. This situation is making it increasingly difficult for me to maintain the current level of our "credible trial threat" and promote that threat to higher levels. It has been almost two years since Kephart vs. Toyota started trial in February 2004, and all the 4Runner rollover cases that have gone to trial have been under my management. Others need to take 4Runner rollover cases to trial. Even if cases can be settled, others need to pick 4Runner rollover cases to try because I should not have to create, maintain and promote this very important "group" goal on my own. It has been damaging to my personal health and family. I have spent 75 days away from home attending trials and mediations in 2005. It takes a personal and professional effort to manage cases into trial to minimize risks/costs and maximize benefits. The personal and professional sacrifices are tremendous. If others would take 4Runner rollover cases to trial, there would not be such an urgent need for cases under my management to go to trial and Toyota/I could benefit from other cases going to trial.

14

90

Additionally, settlement of the Evans case during the trial in Victoria, Texas was not good for Toyota in general and management of cases in Texas in particular. If people believed that case should have been settled for an amount that was even in excess of outside counsel's "reasonable settlement value" opinion, then that settlement should have taken place before trial when the trial judge ordered a Mandatory Settlement Conference or soon after the jury research results in August 2005 (there was plenty of time to get rid of the case at that time) – not immediately before closing arguments during trial. That settlement is a bad precedent for Toyota in Texas and elsewhere. This is yet another example of everybody not having a global vision of one of our primary "group" missions ("credible trial threat"). Note: I should not be criticized for identifying Evans as a case to be transferred to Doug Bishop because (a) I was told to identify a number of my case to transfer because I was getting involved in the Greenberg litigation (although I disputed that need), (b) Doug Bishop participated in numerous corporate witness depositions in Evans when I was engaged in Kephart between February and May 2004, so he was very familiar with the case, (c) Don Marshall accepted my Sturm/Garza case and managed that case at trial in the "Valley", Texas, in August 2005, so it was not fair to give him another trial candidate the following month, and (d) I had numerous 4Runner rollover cases set for trial during the same period that Evans was set for trial in September 2005 (Cantu was set for August 16, 2005, Hunsberger was set for August 28, 2005, Uy was set for September 12, 2005, and Naranjo was set for September 17, 2005).

Furthermore, no action has been taken to learn from the Evans experience to promote the "group" goal of creating a "credible trial threat." Although I managed that case for almost two years, nobody asked me if the case should settle immediately before closing arguments. Clearly, there was a disconnect between my evaluation of $500,000 and the settlement of $2.4 million. Yet, nobody has approached me since the settlement to discuss this settlement, the reasons for the settlement and what should be done in the future to avoid this situation from happening. I can only conclude that somebody is defensive about this settlement and wants to put it behind him. Again, I find the avoidance of this topic interesting (and indicative of the miscommunication/no coordinated communication concern addressed above) because I communicated with everybody about Don Tandy following the Ramos-Guajardo trial (after obtaining a defense verdict), and there was a full blown investigation about Don Tandy with Chris Spencer/Doug Bishop (without informing me and getting my views before the meeting) visiting Don Tandy in Houston (improperly concluding that a "lack of trial preparation" was the cause of Don Tandy's trial performance, the unnecessary creation of "stock-board" test report documents for Don Tandy and an implicit – if not explicit – suggestion by Chris Spence and/or Doug Bishop that counsel (Kurt Kern, and/or me) failed to properly prepare Don Tandy), Kurt Kern/David Graves/Doug Bishop/Eric Taira and I having a private meeting about Don Tandy, and then having a full blown discussion at the May 2005 Quarterly Meeting about Don Tandy's trial preparation in the name of perfecting our approach to trial preparation and management of cases at trial. However, in the Evans situation, nothing has been done to discuss the failure modes in that case among Managing Counsel and outside counsel to promote our "credible trial threat" philosophy. The inconsistency between how we reacted in Ramos-Guajardo/Don Tandy

and Evans is almost hypocritical. The silence on the Evans settlement is deafening and is creating a lot of silent blame.

It is my recommendation that Managing Counsel should be "encouraged" to take cases to trial. If everybody would fulfill the group goal of taking two cases trial (10 cases between 5 Managing Counsel), then we would be better off."

If Eric Taira would encourage the other Managing Counsel to take 4Runner rollover cases to trial, or not give authority to settle cases above $250,000, then I would not have to take so many cases to trial, and I would be able to preserve the company's resources.

Additionally, there are some cases that can not be settled for a reasonable sum, and taking those cases to trial is much more economic and preserves more company resources. For example, in 2006 I managed the Barahona litigation involving Mikal Watts (the most notorious and talented plaintiffs' trial attorney who hit Ford Motor Company for $200,000 in various trials during 2005), a 6 year old ventilated quadriplegic, in one of the worst jurisdictions because the Trial Judge was biased towards the plaintiffs. Plaintiffs demand before trial was $32 million and plaintiffs reduce their settlement demand at the end of trial to $31 million. That case could not possibly settle for any sum under $12 to $15 million. Toyota spent $5 million to defend the case through trial, and I work relentlessly to have the case properly prepared for trial. Toyota obtained a defense verdict, and Toyota saved (not spent) $7 million to $10 millions.

## B.    Learning about Business Operations.

Eric Taira has not given me any opportunities to work with other Toyota companies to learn the business units and company's operations. I repeatedly requested additional work assignments, but he never made any. I had to take the initiative to learn about the business units and company's operations through my investigations at TEMA, TTC, TMA-DC, and TMS related to E-Discovery issues. Furthermore, up until very recently, he would not support my repeated request to conduct similar investigations at TMC, as we are legally obligated to do so in order to fulfill our ethical and legal responsibilities related to E-Discovery.

## V.    Future Goals and Responsibilities.

Major goals for Mr. Biller include: "(3) developing relationships with outside counsel with a view toward fostering the Toyota 'co-counsel' ideal borne of mutual trust, joint decision-making and shared risk-taking; and (4) developing and integrating eDiscovery processes into traditional case management team discovery handling procedures together with Lyn Aase, our litigation Support Manager.

## A.    Relationships with Outside Counsel.

16

92



The first criticism above is simply not well founded. I have informed Eric Taira that I addressed this same criticism last year when he made the same comment. I informed Eric Taira of the following:

"I have deepen my working relationship with Toyota's outside counsel by focusing on those attorneys who practice law consistent with the "Toyota Way", and minimize my energies with counsel who conduct themselves in ways that undermine the "Toyota Way." It is simply impossible to "deepen relationships with all (emphasis added) of our outside counsel" if "all" means every attorney representing Toyota. There are only 24 hours in a day, and not "all" of Toyota's attorneys deserve to have a substantial relationship with Toyota. As a result, I have put more and positive energy into those relationships that will help Toyota in its "long term litigation management success" by not wasting efforts with some attorneys who are not acting in Toyota's best interests and who are actually detrimental to Toyota. This has required me to cut the fat, and go with more lean, mean and talented attorneys. For example, I transferred all the cases assigned to Jim Halbrooks to Bard Borkon of Bowman and Brooke because (a) Jim Halbrooks has been dishonest, untrustworthy, has deteriorated as a quality lawyer, does not have a good working relationship with David Graves (the patriarch of Toyota's National Rollover Program), thinks of his personal interests ahead of Toyota's interests, and in violation of Toyota's Ethical principles, and (b) Bard Borkon has the talent, energy, dedication, devotion, skill, experience and ethical conduct to properly represent Toyota. The nature of the Quarterly Meetings and the amount of information that is being exchanged, and progress of program projects, with Bard Borkon's involvement and Jim Halbrook's elimination is unbelievable and speaks volumes about Bard's qualities versus Jim's qualities. Additionally, I have referred many matters to Kevin Curry, Larry Mann, Paul O'Neil, Vince Galvin, Paul Carver, Barry Toone, Raj Sivanathan, Jill Goldsmith, Mike Madakoro, Gregory Gilmer, Frank Hosfstetler, and others at Bowman & Brooke to spread the rollover work from David Graves and to "deepen" my relationships with Toyota's counsel. In 2004 and 2005, most of the rollover cases were assigned to David Graves and Jim Halbrooks, but now it is more evenly spread between many more Bowman & Brooke attorneys. Additionally, I have further cultivated my decade long relationship with Raj Sivanathan by seeking his advise on discovery issues, asking him to assist me with legal issues surrounding e-discovery, and seeking his advice on discovery areas that may assist Toyota in discovery matters. I have also had private meetings with Raj to make sure he is happy at Bowman & Brooke and I have continuously reminded David Graves of Raj's importance to Toyota. I seek the guidance and counsel of David Graves very frequently to help me deal with the performance issues with Toyota's counsel and to manage the rollover program. I have brought Joe Valentine in e-discovery matters to cover privileged issues in Green, and Campagna. Furthermore, I have transferred cases from Jose Luzarrage to David Stone at Hartline Dacus to get better performance and representation from Hartline Dacus. This has brought Brian Rawson into the Toyota Team at Hartline Dacus because he is the associate assigned to help David Stone. Hartline Dacus now

 

has more talented, skilled, energetic, and professional attorneys on the Toyota Team and Toyota is benefiting from these moves."

"I have worked very hard to further develop a closer relationship with outside counsel to foster "mutual respect", "joint decision making" and "trust." I don't think there is another Managing Counsel who has worked harder in this endeavor. I seek to affirmatively praise outside counsel on their achievements by sending letters and e-mails of thanks, letting outside counsel understand and know my specific expectations through an exhaustive Engagement Letter and constant communication, by responding to their e-mails and letters in a timely fashion to "acknowledge" their communications and "recognize" their work, by taking the time to review their work protect and giving both positive and negative feedback for purposes of improvement with more positive communications than negative feedback (believe it or not), and by being honest, forthright, straightforward, and upfront with outside counsel. Additionally, I spent a substantial amount of time preparing a power point presentation, and detailed materials for outside counsel, that I presented to Hartline Dacus on June 20, 2006 in an effort to further the relationship between that firm and Toyota. These materials included memos on my responsibilities and duties at TMS, my expectations of their duties and responsibilities, the "Toyota Way" principles, and specific definitions to understand our relationship. I visited Nelson Mullins to personally make the same presentation to its attorneys working on Toyota cases. I also prepared a presentation for the Outside Counsel Seminar in August 2006 (that I was unable to attend due to the Barahona trial) on Leveraging Case Resolutions Strategies through a Credible Trial Threat to contribute to the seminar."

### B.  Integrating & Developing E-Discovery Processes.

The second comment above is unjustified. I have repeatedly attempted to incorporate E-Discovery processes and procedures into "traditional case management team discovery handling procedures." Eric Taira and TMC have taken aggressive steps to prevent me from achieving this goal. When I wanted to conduct interviews of TEMA personnel related to the "Books of Knowledge" and TRIM, Eric Taira and TMC got together to prohibit me from doing so by (a) reneging on the agreement to proceed with the interviews, (b) by setting up superficial "requirements" before conducting the interviews (getting Shibata-san's agreement, and then getting TEMA & TMC to agree in person – again), (c) disregarding formal requests for assistance from Dan Fuchs of TEMA, and (d) by requiring Dan Fuchs, or Diane Williamson, to conduct the interviews so they can become "more worldly about PL litigation." Additionally, TMC refuses to authorize the production of Green ESI that is clearly discoverable in rollover litigation, and this position is in violation of TMC's legal obligations. Eric Taira refuses to support me in my efforts to get TMC to agree that the Green ESI must be produced. I have repeatedly requested, and it has been denied, for ESI from TMC to prepare cases for trial and to produce ESI in discovery as TMC is legally obligated to do so.

### VI.  Critical Success Factors.



"Mr. Biller is encouraged to enroll in management courses offered by the University of Toyota, including the Management Foundations and Toyota Traditions courses."

I have already taken the Toyota Traditions course offered by the University of Toyota. I already informed Eric Taira in February 2006 that I was going to take additional management courses.

## VI.    Eric Taira's Retaliation against Dimitrios P. Biller

### 1.    Disagreements about the handling of E-Discovery.

I have been very upfront and honest with Eric Taira about E-Discovery issues. There is no secret Eric Taira and I strongly disagree on how to resolve these issues. Some people would say that I have been "critical" of Eric Taira's management of these issues. The above Sections I through V illustrate the level of disagreement.

### 2.    Dysfunctional Work Environment that is Demoralizing

Furthermore, I have been upfront and honest about the dysfunctional work environment in the PL Group. As the Group Leader, Eric Taira is responsible for creating a more positive and healthy work environment. I informed Eric Taira about the dysfunctional work environment last year in my Self Assessment. I stated:

## "B. My Efforts are being Undermined in The Rollover Program.

In an effort to make others feel they have ownership over the Rollover Program (a valid concern that should not be promoted to the exclusion of other equaling important and bigger goals), certain decisions have been made that were potentially and actually inconsistent with the interests of Toyota. In the process, my views have been ignored, minimized and subjected to disrespect in such a way that I was made to look invaluable and feel horrible. Only a couple examples are needed to substantiate this point.

The first example involves Chris Spencer. Doug Bishop's desire to include Chris Spencer as a "regular" member of the National Rollover Program and the decision to include Chris Spencer as a "regular" member was simply the wrong decision. However, the manner in which that decision was made is indicative of how my efforts are being undermined. I gave very specific, reasonable and logical reasons to not include Chris Spencer in the program (Chris was not a team player, Chris managed to insult his clients/partners/colleagues/peers with his arrogance so the meetings would not be productive, Chris did not openly share information, and Chris turned Toyota down on numerous occasions when Toyota needed his services). However, Doug Bishop's reasons were not, in my opinion, reasonable (he liked working with his, Chris was handling approximately 6 rollover cases for Doug Bishop, Chris has a lot of general rollover information and Chris Spencer was working on the VSC project). Doug's reasons would justify regularly inviting Joel Dewey and Joel Smith to the meetings. The

main reason, perhaps the real reason, that Chris Spencer was initially invited to be a "regular" participate in the Rollover Program was to keep a close relationship with Don Tandy, but this reason was never expressed before the decision was made and, in my opinion, is the wrong reason. We simply can not maintain real and meaningful relationships with people through relationships with third parties. I distinctly remember the horrible emotions I felt when the decision was announce because I was not even asked at that meeting how I felt; instead, the decision was simply made without addressing my concerns, after asking Doug Bishop/Luke Torres about their feelings and ignoring me. Unfortunately, Chris Spencer proved to be irresponsible when he bailed out of the Atchar trial, failed to inform TMS about his conflict in a timely manner, abandoned the VSC project, managed to insult me and Kurt Kern in the July 19, 2005 Rollover Meeting because of Don Tandy's performance, and failed to inform me and others (his partners) about the NHTSA Phase I testing discovered during the Powell deposition preparation of Yonekawa. All the reasons used to justify the initial decision still exist, but he is now (thankfully) not part of the program because Chris Spencer repeated all of the concerns I expressed to substantiate my position.

Another example relates to the Tundra testing. The decision to allow Don Tandy to conduct the V-8 Tundra testing was inconsistent with prior understandings, and gave difference to others who did not follow accepted protocols. More importantly, nobody ever addressed the valid reasons I believed and continue to believe to justify that Lee Carr should do that testing. Instead, those reasons were ignored to make others feel like they have ownership of the program and/or to give Don Tandy some more "love" (although Don continues to disappoint Toyota by (a) failing to complete special projects in a proper and timely manner — utility demonstration that took 6 months to complete —, (b) failing to properly prepare for trial, (c) incomplete/inaccurate accident reconstructions, and (d) misleading statements regarding the reasons for his lack of preparation). Furthermore, when I specifically asked Doug Bishop to answer my questions about Don Tandy conducting the Tundra testing, Doug stated he did not have to answer my questions and nobody instructed him that he was obligated to answer questions by co-Managing Counsel. Don Tandy's performance on that testing was less than perfect and was unnecessarily delayed. When Doug and I exchanged our views on this issue, I warned something might go wrong.

I have been mistreated during meetings and subject to disrespect and embarrassment. On many occasions during meetings with other Managing Counsel my opinions and views were not asked for or were prematurely dismissed without adequate consideration. Instead, the views of the other Managing Counsel were sought, presumably because those views were consistent with the direction that wanted to be pursued. For example, during the second meeting on whether Chris Spencer should be included as a regular participate in the Rollover Program, I was not even asked on how I felt; instead, other Managing Counsel were asked how they felt (they both recommended that Chris Spencer be invited). During the meeting on cutting down the list of invitees to the National Rollover meetings, when I voiced my disagreement about inviting Jim Halbrooks, my view was almost immediately dismissed until I asked "don't you want to hear the reasons for my position." When I gave those reasons, it was like talking to a wall. However, when other Managing



Counsel supported my views, a compromised position was accepted (invite Jim Halbrooks for morale and Bard Borkon because he deserves it/we need him). These two incidents show that I have been treated with disrespect; it appears to me that I have been singled out as someone who does not have anything important to say. This treatment is demoralizing, embarrassing, and wrong. History has shown my positions are well reasoned and were the correct path to follow.

The most amazing part of this serious concern is that there appears to be more concern about outside counsel who have committed ethical violations, and attempted to improperly use my name to promote their own interests adversely to the interests of Toyota. In other words, there is more effort to protect outside counsel who have a longer relationship with Toyota than there is devoted to protecting a in-house representative of TMS. This type of management is disruptive, destructive, and damaging to a positive work environment because it is demoralizing.

It is my recommendation that we stop making decisions based on the unreasonable "sensitivities" of people (because of their insecurities and defensiveness) and we need to take decisive action based on the reasonable, logical, concrete and valid reasons that support the right decision.

## C. Lack of Direct and Coordinated Communication.

The above situations involving Jim Halbrooks, Tundra testing and Chris Spencer are also good examples of a lack of direct and coordinated communication that has cost Toyota time and money through confusion, mistakes and creation of distrusting environment. I have previously voiced my serious concerns about a failure to communicate directly, to coordinate communication and to share information among all Managing Counsel on rollover cases. The Tundra testing experience above and the Evans settlement at trial below are perfect examples of poor communication that is undermining "group" goals (managing 4Runner/rollover litigation in a coordinated manner and promoting a "credible trial threat.")

Additionally, on two occasions I was essentially told how to handle/resolve cases in front of a group of outside counsel without being consulted. This approach to supervising me on how to handle cases, in my opinion, is not appropriate. It was strongly suggested at the May 2005 Quarterly Meeting that I resolve the Hunsberger/Butterfield cases to avoid E-Discovery issues without being consulted on how to deal with that issue before the meeting. It was announced at the July 19, 2005 Quarterly Meeting that the Sears case should be settled to avoid some sensitive issues on E-discovery. I was never consulted before this announcement. If I am Managing Counsel on cases, then I should be consulted on how cases should be resolved. Even if settlement of these cases was the appropriate action, the manner in which that course of action was initiated was simply wrong because it showed a lack of confidence and was "micro-management" that is inconsistent with the type of management TMS has historical pursued. Micro-management results in a demoralizing environment.

21

Something has happened to cause this recent micro-management. For example, when Toyota had to make a decision on whether to take Naranjo to trial in July/August 2003, I was approached in private to get my views on how that case should be handled. Although there was a disagreement on how to resolve that case (trial vs. settlement), there was a healthy debate and discussion in private before the Quarterly Meeting. Those views were then announced at the Quarterly Meeting for further debate. The handling of the Naranjo situation is completely different from how management decisions were unilaterally imposed on me without any private discussion on Hunsberger, Butterfield and Sears during 2005. Despite the fact that I have shown outstanding abilities in identifying viable trial candidates, making sure those trial candidates matured into defense verdicts, and settled dozens of cases for figures far less than recommended by outside counsel in the last 2 ½ years, while managing global and "big picture" issues, I have been subject to micro-management of cases without being shown proper difference and/or respect when there was an interest to get Hunsberger, Butterfield and Sears settled. If I have done something wrong, I should know mistakes have led to this situation.

It is my recommendation that all Managing Counsel and our group should be encouraged (instructed) to exchange information, answer questions and mutually share views. Coordinated and full communication in today's world can easily be accomplished via e-mail."

### 3.     Inadequate Compensation.

I have repeatedly told Eric Taira that I do not want to receive a "lump sum" bonus as a salary increase, and I need to receive my salary increase via a percentage increase. For example, this year my merit increase was 1%, but I also received a lump sum bonus that was 4.49% of my salary. Although I have tremendously grateful for the bonus, it adversely affects my salary over time. I informed Eric Taira last year of the following:

**"C. My Position and Career.**

I understand that TMS recognized my significant contributions last year when TMS adjusted my financial package and allowed me to take two additional weeks off. I am very thankful and grateful to TMS for these gestures and commitment. It was very important for me to receive this commitment because I felt I made tremendous financial and human sacrifices resigning from Pillsbury Winthrop to take my current position and I would not have made that change if I fully understood the severe mismanagement of the National Rollover Program that pre-dated my arrival and that led to the deterioration of the program that I had to clean up. I have some concerns about any fall out relating to the adjustment in my financial package. First, and foremost, I'm concerned that I will be resented for requesting a readjustment. Nobody knows about my financial package other than my supervisors and my family. Second, I'm concerned that there will be the misperception that I'm unhappy about my current position. I am very happy and satisfied with my current situation and do not have any resentment about being "Managing Counsel" at TMS. Third, I'm concerned that I will not receive the maximum annual raises and bonuses I should receive based on my performance because there may be the



misperception that last year's adjustment compensated me for my hard work and excellent results. Again, I view last years financial adjustment to correct a historical mistake related to my initial signing bonus and initial starting annual salary in 2003, not a reward for the achievements of last year. Although I confirmed this understanding with Dian Ogilvie and Eric Taira, I am anxious about this year's assessment and annual increase/bonus because it will be the first time I will be assessed following last year's adjustment. Fourth, I want to end my legal career with TMS and continue to progress within the Legal Department, but I'm concerned that my opportunities will be limited. Fifth, I believe I should receive the maximum annual raise and bonus in the department because the time commitment I made last year, the number of hours I worked, the time I spent away from home, the results I obtained, and the magnitude of the money I save Toyota are simply unprecedented."

Eric Taira did not communicate my concerns and request to the Leadership Committee when merit increases were being discussed.

Dimitrios P. Biller _____    Eric Taira _____    Dated _____

# EXHIBIT "2"

# CONFIDENTIAL SEVERANCE AGREEMENT AND GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS

This CONFIDENTIAL SEVERANCE AGREEMENT AND GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS ("Agreement") is entered into by and between Toyota Motor Sales, U.S.A., Inc. ("TMS" or "Employer") and Dimitrios P. Biller ("Associate"), (collectively, the "Parties"). As used in this Agreement, the terms "Affiliate" or "TMS-affiliated company" refers to any person or entity that directly or indirectly controls, is controlled by, or is under common control with TMS.

## RECITALS

WHEREAS, Associate's employment will end in any capacity with TMS (or any TMS-affiliated company) on September 17, 2007 ("Separation Date");

WHEREAS, if Associate accepts and signs this Agreement, and does not revoke such acceptance within seven calendar days after signing this Agreement, then this Agreement will become effective on the eighth day after Associate has signed and returned this Agreement to legal counsel for TMS ("Effective Date");

WHEREAS, TMS and Associate desire to resolve any and all potential claims that may exist between them in accordance with the terms and conditions set forth in this Agreement;

NOW THEREFORE, in view of the foregoing and in consideration of the mutual covenants and promises contained herein, Associate and TMS agree as follows:

## AGREEMENT

1. Final Wages and Vacation

TMS will pay Associate for all earned but unpaid wages and all accrued but unused vacation through the Separation Date. Payment of these sums will be subject to applicable deductions and withholdings as required or permitted by law. Associate will receive these sums whether or not Associate signs this Agreement. Associate acknowledges that Associate has submitted and been reimbursed for all business expenses.

2. Consideration

Associate acknowledges that the consideration outlined below constitutes good and valuable consideration to which Associate is not otherwise entitled by reason of Associate's employment with TMS.

2.1. <u>Severance Payment - Wages</u>. Within seven (7) calendar days following Separation Date or re-execution of this Agreement on or after Separation Date as provided herein,

Initials: Biller    TMS

CONFIDENTIAL

whichever is later, TMS will mail to Associate's Notice Address provided in Paragraph 8 (Notice) of this Agreement, a lump sum payment in the gross amount of Four Hundred Fifty-Five Thousand, Three Hundred and Twenty Dollars and No Cents ($455,320.00) ("Severance Payment - Wages"). This Severance Payment - Wages is subject to deductions and withholdings as required or permitted by law. This Severance Payment - Wages will be reported as gross wages on Associate's W-2 form for the calendar year in which it is paid.

No 401k deduction can be made from this Severance Payment - Wages because such a payment is not included in the 401K Plan's definition of "Base Pay Compensation." Accordingly, no 401k match payment will be made. Similarly, this cash-out payment is not taken into account under any other TMS/TMS-affiliated company plan.

2.2. <u>Severance Payment – Non-wages.</u> TMS agrees to pay Associate a lump sum payment in the gross amount of Two Million, Two Hundred Ninety-Four Thousand, Six Hundred and Eighty Dollars and No Cents ($2,294,680.00) for alleged emotional distress damages ("Severance Payment – Non-wages"). The Severance Payment – Non-wages will be reported as a non-wage payment in Box 1 of Associate's W-2 and will not be subject to payroll taxes or federal, state and local income tax withholdings at the time of payment. TMS will mail the Severance Payment – Non-wages to Associate's Notice Address provided in Paragraph 8 (Notice) of this Agreement within seven (7) calendar days following Separation Date or re-execution of this Agreement on or after Separation Date as provided herein, whichever is later.

No 401k deduction can be made from this Severance Payment because such a payment is not included in the 401K Plan's definition of "Base Pay Compensation." Accordingly, no 401k match payment will be made. Similarly, this cash-out payment is not taken into account under any other TMS/TMS-affiliated company plan.

2.3. <u>Attorney's Fees.</u> TMS agrees to pay Associate's attorney's fees in the amount of Nine Hundred, Fifty Thousand Dollars and No Cents ($950,000.00) ("Attorney's Fees Payment"). TMS will mail the Attorney's Fees Payment to Michael J. Faber within seven (7) calendar days following Separation Date or re-execution of this Agreement on, or the receipt of a W-9 form properly completed on behalf of Michael J. Faber, whichever is later. TMS will issue to Michael J. Faber a Form 1099 consistent with applicable law.

2.4. <u>Forgiveness of Loan.</u> As consideration for the re-execution of this Agreement on or after Separation Date as provided in Paragraph 3 (Waiver and Complete Release), TMS agrees that the April 22, 2005 Loan Agreement between Associate and TMS is hereby modified to delete the requirement of continued employment and the loans stated therein will be forgiven and reported to tax authorities for tax purposes as compensation according to the schedule stated therein.

Initials _____    _____
          Biller             TMS

82907809.1 013186.1090                    2


CONFIDENTIAL

2.5. <u>Tax Consequences</u>. TMS makes no representations or warranties with respect to the tax consequences of the payment of any sums under the terms of this Agreement. Associate agrees and understands that he is responsible for payment, if any, of local, state and/or federal taxes on the sums paid hereunder by TMS and any penalties or assessments thereon. Associate further agrees to indemnify and hold TMS harmless from any claims, demands, deficiencies, penalties, assessments, executions, judgments, or recoveries by any government agency against TMS for any amounts claimed due on account of: (a) Associate's failure to pay federal or state taxes, any allegation that TMS failed to withhold, or Associate's delayed payment of federal or state taxes; or (b) damages sustained by TMS by reason of any such claims, including attorneys' fees and costs.

3. Waiver and Complete Release

<u>General Release - Associate</u>. In consideration of the mutual promises herein and by TMS in Paragraph 2 (Consideration) of this Agreement, on behalf of Associate and Associate's dependents, descendants, heirs, executors, administrators, assigns and successors, Associate hereby knowingly and willingly, wholly and forever releases and discharges TMS and/or its parents (Toyota Motor North America Inc. and its parent Toyota Motor Corporation), and each of them and/or its or their present and past subsidiaries, divisions, business units, related corporations, affiliated entities, shareholders, officers, directors, co-venturers, partners, insurers, employees ("associates"), consultants, contingent workers, independent contractors, agents, attorneys, employee benefit programs (and the trustees, administrators, fiduciaries and insurers of such programs), predecessors, successors, purchasers, assigns and representatives (collectively, "TMS Releasees"), from any and all legally waivable charges, grievances, claims, promises, wages, demands, debts, actions or causes of action, obligations, damages and liabilities of whatever kind or nature, whether known or unknown, suspected or unsuspected, which arise out of or are in any way connected with: (1) Associate's hiring by TMS; (2) Associate's employment relationship with TMS; (3) Associate's participation in employee benefit programs; or (4) Associate's separation from TMS; and any claim which Associate now has, has had, or may have, in any way arising from or relating to any act, omission, occurrence or transaction occurring up to and including the date this Agreement is signed ("Released Claims"). This is a General Release. Associate shall on or after Separation Date, and for the Consideration given herein in paragraph 2.4 (Forgiveness of Loans) of this Agreement, re-execute this Agreement so as to cause, and intend, that this General Release shall be effective as of Separation Date or the date of re-execution by Associate, whichever is later.

<u>General Release - TMS</u>. In consideration of the mutual promises herein, TMS hereby knowingly and willingly, wholly and forever releases and discharges Associate, attorneys, heirs and representatives (collectively, "Associate Releasees"), from any and all legally waivable charges, grievances, claims, promises, wages, demands, debts, actions or causes of action, obligations, damages and liabilities of whatever kind or nature, whether known or unknown, suspected or unsuspected, which arise out of or are

Initials: _____ _____
          Biller   TMS

CONFIDENTIAL

in any way connected with: (1) Associate's employment relationship with TMS or (2) Associate's separation from TMS; and any claim which Associate now has, has had, or may have, in any way arising from or relating to any act, omission, occurrence or transaction occurring up to and including the date this Agreement is signed ("Released Claims"). This is a General Release.

3.1. <u>Waiver of Age Discrimination in Employment Act of 1967.</u> Associate also expressly acknowledges and agrees that:

(1) Associate has carefully read and fully understands all of the provisions of this Agreement and understands that through this Agreement, Associate is releasing TMS and the other TMS Releasees from any and all claims Associate may have against them;

(2) Associate is waiving any and all rights, charges or claims that Associate may have arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et. seq., as amended by the Older Workers Benefit Protection Act ("ADEA"), which have arisen on or before the date this Agreement is signed;

(3) Associate is not waiving any rights or claims that may arise after the date that this Agreement is signed;

(4) This waiver and release is knowing and voluntary and the consideration given for this waiver and release is in addition to anything of value to which Associate was already entitled as a TMS Associate;

(5) Associate was advised and is hereby advised in writing to consult with an attorney of Associate's choice prior to signing this Agreement;

(6) Associate has the opportunity of a full twenty-one (21) calendar days within which to consider this Agreement before signing it, and that if Associate does not take that full time period, Associate does so knowingly and voluntarily, and further agrees Associate will not assert the invalidity of this Agreement or any portion thereof on this basis;

(7) Associate has a full seven (7) calendar days after signing this Agreement to revoke this Agreement ("Revocation Period"), and has been and is hereby advised in writing that this Agreement, all of its terms, and all of its obligations of the TMS Releasees contained herein, shall not become effective or enforceable until this Revocation Period has expired.   To revoke this Agreement, Associate must provide written notice of revocation to Matthew Gonzales at the Notice address in Paragraph 8 (Notice) no later than the end of the seventh day after the Associate signs this Agreement and TMS must actually

Initials: _____     _____
          Biller         TMS

CONFIDENTIAL

receive such written notice of revocation. The Revocation Period may not be waived. If Associate revokes this Agreement, Associate will not receive any consideration under Paragraph 2 (Consideration) of this Agreement and Associate's release of ADEA claims will not go into effect.

3.2. <u>Waiver of Unknown Claims</u>. It is a further condition of the consideration herein and it is the intention of the Parties in signing this Agreement that the Agreement shall be effective as a bar to the Released Claims in Paragraph 3 (Waiver and Complete Release) and, in furtherance of this intention, the Parties hereby expressly waive any and all rights or benefits conferred by the provisions of California Civil Code § 1542 and of any similar rule of law adopted by statute or otherwise in any jurisdiction of the United States including, but not limited to California, and expressly consent that this Agreement shall be given full force and effect according to each and all of its express terms and conditions, including those relating to unknown and unsuspected claims, demands and causes of action, if any, as well as those relating to other claims, demands and causes of action specified in Paragraph 3 (Waiver and Complete Release). Section 1542 of the California Civil Code provides:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor."**

The Parties acknowledge that they may hereafter discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the subject matter of this Agreement and, which, if known or suspected, at the time of signing this Agreement, may have materially affected this Agreement. Nonetheless, the Parties acknowledge that they understand the significance and consequence of such release and such specific waiver of SECTION 1542.

3.3. <u>Claims Not Released</u>. This Agreement does not release claims based on obligations created or reaffirmed by this Agreement; claims based on any vested pension rights or any other claims which, by operation of law, cannot be waived, including, without limitation, any workers' compensation claims.

3.4. <u>Ownership of Claims</u>. The Parties represent and warrant that they have not assigned or transferred any claims they are purporting to release nor have they attempted to do so.

4. <u>Associate's Obligations and Representations</u>

4.1. <u>Associate Acknowledgement of Consideration</u>. Associate acknowledges that the consideration set forth in Paragraph 2 (Consideration) above is the only consideration to which Associate is entitled under this Agreement. Associate agrees that the foregoing shall constitute an accord and satisfaction and a full and complete settlement of Associate's

Initials: _____     _____
        Bill          TMS

CONFIDENTIAL

claims, shall constitute the entire amount of monetary consideration provided to Associate under this Agreement except as provided herein, and that Associate will not seek any further compensation for any other claimed damage, costs or attorneys' fees in connection with the matters encompassed in this Agreement.

## 4.2. Disengagement

4.2.1. Associate specifically represents and warrants that Associate has no unreported work-related injuries. Associate represents and warrants that Associate has no workers' compensation claim to file that has not already been filed regarding Associate's employment with TMS.

4.2.2. Associate specifically represents and warrants that Associate currently has no pending claim for violation of the Fair Labor Standards Act or the Family and Medical Leave Act and has had no such claims in the past.

4.3. Confidentiality of Agreement. Associate represents and warrants that Associate has not disclosed (with the exception to Michael Faber, his spouse, his psychiatrist, and Mark Rudy) and shall not disclose the underlying facts that led up to the severance of employment evidenced by this Agreement, or the terms, amount or existence of this Agreement to anyone (including, but not limited to, any former or current associate of TMS or the news media), for any reason in any manner without the prior written consent of TMS. If asked about the underlying facts, terms, amount or existence of this Agreement, Associate may make only the following statement: "My employment at TMS ended and all issues were resolved." Notwithstanding the foregoing, Associate may disclose the terms of this Agreement to Associate's spouse and to Associate's legal, financial, or tax advisors. However, prior to any disclosure, Associate shall notify such third parties of the confidential nature of this Agreement and shall secure their commitment to maintain said confidentiality. A violation of this Agreement by such a person will be treated as a violation of this Agreement by Associate. Associate agrees that any disclosure by Associate (or by any permitted recipient) in violation of the foregoing shall constitute and be treated as a violation of this Agreement. As the damages TMS would suffer if this provision were violated would be difficult to calculate, Associate promises to pay TMS Two Hundred Fifty Thousand and No Cents ($250,000.00) for each violation. This paragraph does not prohibit disclosures to the extent necessary to legally enforce this Agreement or to the extent required by law, nor does it prohibit disclosures to the extent otherwise legally required, including reporting all payments made pursuant to this Agreement to the Internal Revenue Service and other local, state and federal taxing authorities. If disclosure of this Agreement or its terms is, or is asserted to be, required by law, whether through subpoena, request for production, deposition, or otherwise, Associate shall provide written notice to TMS at least thirty calendar days prior to the disclosure. If such notice is not possible, Associate shall provide written notice to TMS as soon as practicable under the circumstances, so as to provide TMS a sufficient opportunity to oppose the disclosure.

Initials: _____      _____
         Bird         TMS

**4.4. Payment of Taxes and Indemnification of TMS.** Associate acknowledges that Associate has not received and has not relied upon any purported tax advice from TMS or other Releasees. Associate acknowledges and agrees that Associate, and not TMS, will be solely responsible for all tax obligations, if any, arising from the payment of consideration specified in Paragraph 2 (Consideration) and its subparts. Associate agrees to promptly pay and to defend (including paying for all the costs of defense) indemnify, hold harmless TMS and other Releasees for any taxes, penalties, interest found due and owing as a result of any consideration paid under this Agreement.

**4.5. Non-Disclosure of Confidential and Legally Privileged Information.** Associate acknowledges that, by reason of Associate's position as an attorney with TMS in its Legal Department, Associate has been given access to confidential materials or information regarding TMS and TMS Releasees and/or the business affairs of TMS and TMS Releasees.

4.5.1. For purposes of this Agreement, "Confidential Information" includes, without limitation, all information given or otherwise transmitted to Associate by TMS or TMS Releasees in the course of Associate's legal representation of TMS or TMS Releasees, all information classified as confidential or protected by TMS, information furnished to Associate by TMS or TMS Releasees or otherwise obtained by Associate, transmitted in writing, orally, visually (i.e. video terminal display) or on magnetic media, including all financial and credit information, product plans and technologies, all types of trade secrets (as defined by the Uniform Trade Secret Act), know-how, ideas, concepts, inventions, designs, drawings, sketches, flow charts, blue prints, diagrams, manufacturing and test data, engineering knowledge, computer programs, progress reports, methods research, procurement procedures, marketing and sales activities and procedures, pricing, distribution, personnel data, payroll data, employee benefits, employment policies, privileged communications, attorney-client communications, attorney work product, litigation and case handling or strategies, vendor data, contracts and any other confidential or proprietary information relating to TMS or TMS Releasees.

4.5.2. Associate agrees that on or before Separation Date, Associate shall return to TMS any Confidential Information or related materials, including, without limitation, electronic data maintained on personal computers, laptops, PDAs (i.e. Blackberry or similar devices), CDs, DVDs, computer disks. In addition, Associate shall permanently delete and destroy any Confidential Information or related materials that Associate currently maintains electronically in any form, and shall not copy such Confidential Information or materials in any form or manner.

4.5.3. Associate agrees to continue to abide by the terms of any Non-Disclosure agreements signed at the commencement of or during employment or any other non-disclosure obligations incurred during Associate's employment.

4.5.4. Unless specifically authorized in writing by TMS, Associate shall not disclose or use any Confidential Information. Associate represents that Associate has held such information confidential and will continue to do so, and that Associate will not use

Initials: _____    _____
Biller          TMS

such information and relationship for any purpose without the prior written consent of TMS.

4.5.5. Associate expressly represents and warrants that Associate has not disclosed Confidential Information to any other third party. To the extent Associate cannot so represent and warrant, and has disclosed Confidential Information to Associate's spouse, Associate's legal counsel or any other third party, on or before Separation Date, Associate shall identify such persons or third parties to TMS by name and address, with an identification with specificity of the Confidential Information disclosed to such persons or third parties. In the case that the disclosed Confidential Information is in documentary or other physical form, Associate shall obtain the return of such to TMS, and if in or electronic form, Associate shall secure the destruction of such to the satisfaction of TMS. Associate shall notify such persons or third parties of the confidential nature of such Confidential Information and shall secure their commitment to maintain the confidentiality of such.

4.5.6. This paragraph does not prohibit disclosures to the extent required by law. If disclosure of such Confidential Information is, or is asserted to be, required by law, whether through subpoena, request for production, deposition, or otherwise, Associate shall provide written notice to TMS at least thirty calendar days prior to the disclosure. If such notice is not possible, Associate shall provide written notice to TMS as soon as practicable under the circumstances, so as to provide TMS a sufficient opportunity to oppose the disclosure. Associate shall not, directly or indirectly, solicit such legal action attempting to compel disclosure of Confidential Information.

4.5.7. Associate agrees that any violation of the foregoing provisions of this paragraph and/or its sub-paragraphs, including each disclosure by Associate or any person or third party to whom Associate has disclosed Confidential Information to and/or received by an unauthorized person or third party in violation of the foregoing provisions of this paragraph and/or its sub-paragraphs, shall constitute and be treated as a separate violation of this Agreement. As the damages TMS would suffer if this provision were violated would be difficult to calculate, Associate promises to pay TMS Two Hundred Fifty Thousand and No Cents ($250,000.00) for each violation.

4.5.8. Associate agrees that Associate's entitlement to consideration in Paragraph 2 (Consideration) is expressly conditioned upon Associate's full compliance with the terms of this paragraph.

4.6. Agreement Not to Facilitate Legal Action against Releasees. Associate agrees that Associate will not voluntarily discuss, communicate about in any manner, consult with, advise, counsel or otherwise encourage, cooperate with or assist any associates or former associates of TMS or any third parties, including any counsel adverse to TMS or any TMS Releasee, or represent any associates or former associates of TMS or any third parties, in the pursuit of any legal or administrative action(s) against TMS or TMS Releasees unless compelled to do so by valid legal process or requested to do so by TMS.

Initials: _____   _____
          Biller               TMS

4.8. **Nondisparagement.** Associate agrees not to disparage TMS or any other TMS Releasee, or their officers, associates, agents, products, brands, services or litigation and case handling or strategies and to act in good faith toward TMS and TMS Releasees.

4.9. **Return of Property.** Associate agrees that on or before the Separation Date, Associate will return to TMS all equipment and other tangible property of TMS or TMS Releasees in his possession and/or the possession of any third party to whom Associate has transferred possession, including, without limitation, identification cards, keys, cell phones, personal digital assistants (PDAs), computers, credit cards, Confidential Information and related materials, documents, books, records, reports, contracts, lists, software, computer disks, other computer-generated files or data, and any copies thereof, created on any medium, prepared or obtained by Associate in the course of or incident to employment with TMS. Associate will also permanently delete and destroy any Confidential Information or related materials that was created or obtained during the course of or incident to employment with TMS that Associate currently maintains electronically in any form on any personal property, including, without limitation, computers, laptops, PDAs, CDs, DVDs, computer disks. As to any vehicle(s) that Associate has leased under TMS' Vehicle Lease Program, Associate shall return the vehicle(s) in good condition and pursuant to the current terms of TMS' Associate Vehicle Lease program no later than Separation Date.

Initials: _____  _____
        Bills       TMS

4.10.    No Future Employment.    Associate understands that Associate's employment with TMS and all related or affiliated companies will terminate forever on the Separation Date. Associate agrees that Associate will not seek, apply for, be eligible for, accept or maintain employment or re-employment with TMS, TMS-affiliated companies or TMS-affiliated dealers as an associate, employee, contingent worker, consultant, temporary employee, independent contractor or in any capacity whatsoever. Associate agrees that TMS, TMS-affiliated companies, TMS-affiliated dealers shall not at any time be under any obligation to employ Associate as an associate, employee, contingent worker, consultant, temporary employee, independent contractor or in any capacity whatsoever. Associate further agrees that this Agreement shall constitute good cause for TMS, any TMS-affiliated company, and any TMS-affiliated dealer not to hire, rehire or retain him as an associate, employee, contingent worker, consultant, temporary employee, independent contractor or in any capacity whatsoever.

4.11.    No Return to Property.    Associate agrees that, as of the Separation Date, Associate will not return to TMS Releasees' property or attend a TMS Releasee event for any reason without the express prior written consent of Matthew Gonzales or his successor and Associate acknowledges the right of TMS Releasees to remove Associate from the property if Associate violates this sub-paragraph.

4.12.    Non-Solicitation of Associates.    Associate agrees not to solicit, directly or indirectly, any Associate or employee of TMS or any TMS Releasee to leave the employment of TMS or any TMS Releasee.

4.13.    Assignment; Successors and Assigns.    The Parties represent that they have not and will not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by operation of law, any rights or obligations under this Agreement, without the express written agreement of the other party.  Any such purported assignment, transfer or delegation is null and void. The Parties represent that they have not previously assigned or transferred any claims or rights released by them pursuant to this Agreement.  Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, successors and permitted assigns.

5.  No Admission of Liability.  The Parties understand and agree that this Agreement and the furnishing of the consideration for this Agreement shall not be deemed or construed at any time or for any purpose as an admission of liability for any and all existing or potential claims.

6.  Dispute Resolution – Final and Binding Arbitration as Exclusive Remedy.

6.1. Agreement to Arbitrate.  The Parties agree that the resolution of certain disputes shall be conducted exclusively through binding arbitration as set forth herein.  The disputes for which arbitration is the exclusive remedy, include, but are not limited to:  (1) all known

Initials: _____        _____
          Biller          TMS

and unknown claims which Associate may have against TMS or any other Releasee which arose at or prior to the date this Agreement is signed and is not extinguished by this Agreement, if any; (2) all known and unknown claims Associate may have against TMS or any other Releasee that in any way relate to the subject matter, interpretation, application, or alleged breach of this Agreement arising at any time prior to, concurrently with or subsequent to Associate's signing this Agreement; and (3) any known or unknown claims that Associate may have against TMS or any other Releasee which arise at any time after Associate signs this Agreement as well as the arbitrability of any dispute (collectively, "Arbitrable Claims"). This agreement to arbitrate does not preclude either party from seeking injunctive relief in court.

6.2. Arbitration Rules and Procedures. The arbitration shall be held in accordance with the rules and regulations of Judicial Arbitration and Mediation Services (JAMS) pertaining to employment disputes. Prior to submitting any dispute to JAMS for final and binding arbitration, the Parties agree to meet and confer in good faith and to submit to an external mediation in an effort to resolve the dispute. If the dispute is not resolved in informal discussions or at mediation, the arbitration shall be final and binding upon the Parties and shall be the exclusive remedy for all Arbitrable Claims. The Arbitrator is required to follow applicable law and case precedent of the jurisdiction where the Associate last worked for TMS and will have full authority to award any relief available to be awarded had the dispute been brought in any other forum such as a federal or state court. The Arbitrator will issue with his/her award a written decision sufficient to permit limited judicial review to enforce or vacate the arbitration award. The Parties will pay their own costs and attorneys' fees associated with the arbitration. Each party will pay their pro rata share of JAMS fees and expenses. Either Party may bring an action in court of competent jurisdiction to compel arbitration under this Agreement or to enforce or vacate an arbitration award. Otherwise, neither Associate nor TMS nor any other Releasee shall initiate or prosecute any lawsuit, administrative action or any other type of dispute proceeding in any forum in any way related to an Arbitrable Claim. Any arbitration held under this Agreement shall be conducted in Los Angeles County, California, unless another location is mutually agreed to by the Parties.

6.3. THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO AN ARBITRABLE CLAIM, INCLUDING WITHOUT LIMITATION, ANY RIGHT TO TRIAL BY JURY AS TO THE MAKING, EXISTENCE, VALIDITY, OR ENFORCEABILITY OF THIS ARBITRATION PROVISION.

6.4. Bargained For Provision. The Parties represent and warrant that the arbitration provisions in this Agreement are specifically negotiated for provisions, including (without limitation) the provisions pertaining to the types of claims to be included or excluded from the definition of Arbitrable Claims and the selection of rules to govern the arbitration. The Parties represent and warrant that these provisions have been bargained for in order to provide for a cost effective and efficient means of resolving

Initials: _____ _____
        Biller    TMS

disputes. The Parties represent and warrant that each agrees to these arbitration provisions knowingly and voluntarily.

7. Employment Verification. Associate shall direct all inquiries regarding Associate's employment to TMS' Employment Verification Center (1-877-248-1635), which pursuant to TMS policy only verifies an Associate's dates of employment and last position held.

8. Miscellaneous

8.1. Notices. Any notice or other communication under this Agreement must be in writing and shall be effective upon delivery by hand or five (5) business days after deposit in the United States mail, postage prepaid, via certified or registered mail addressed to TMS or to Associate at the addresses below. Associate shall be obligated to notify Employer in writing of any change in Associate's address. Notice of change of address shall be effective only when done in accordance with this Section.

Employer's Notice Address
Toyota Motor Sales U.S.A, Inc.
19001 Western Avenue
Torrance, CA 90509
Attn: Matthew Gonzales or his designee
Corporate Manager, Human Resources Consulting

Associate's Notice Address
Dimitrios P. Biller
928 Hartzell Street
Pacific Palisades, CA 90272

8.2. Amendments; Waiver. This Agreement may not be amended except by an instrument in writing, signed by each of the Parties. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power under this Agreement preclude any other or further exercise thereof, or the exercise of any other right, remedy, or power provided herein or by law or in equity.

8.3. Severability. If the Company or Associate successfully asserts that any provision in this Agreement is void, the rest of the Agreement shall remain valid and enforceable unless the other party to this Agreement elects to cancel it. If this Agreement is cancelled, Associate will repay the consideration set forth in Paragraph 2 (Consideration).

8.4. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of California; provided, however, that the arbitration agreement in Paragraph 7 (Dispute Resolution) of this Agreement will be governed by the Federal Arbitration Act unless it is found by a decision maker of competent jurisdiction not to be governed by the Federal Arbitration Act, in which case it will be governed by California law.

8.5. Interpretation. This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any Party. By way of example and not in

Initials: _____ _____
         Biller    TMS

12

limitation, this Agreement shall not be construed in favor of the Party receiving a benefit nor against the Party responsible for drafting any particular language in this Agreement.

8.6. Section Headings.  Section headings are for reference only and should be ignored in interpreting the Agreement.

8.7. Representation by Counsel.  The Parties acknowledge that:  (1) they have had the opportunity to consult with counsel in regard to this Agreement; (2) they have read and understand the Agreement and are fully aware of its legal effect; and (3) they are entering into this Agreement freely and voluntarily, and based on each Party's own judgment and not on any representations or promises made by the other Party, other than those contained in this Agreement.

8.8. Voluntary Agreement.  Associate acknowledges and represents that Associate has read all of the terms of this Agreement and that Associate accepts and agrees to its provisions and hereby signs the Agreement voluntarily and with full understanding of its legal force and effect.

8.9. Entire Agreement.  With the exception of any existing Non-Disclosure Agreement between TMS and Associate, which shall remain in full force and effect according to the terms thereof, this Agreement represents the complete and exclusive statement of the entire agreement between the Parties relating to the Associate's separation of employment and the subject matter of the Agreement and supersedes all prior or contemporaneous agreements and understandings among the Parties, whether written or oral, express or implied regarding the subject matter set forth herein.  The Parties understand and agree that the preceding provisions recite the sole consideration for this Agreement, that no representation or promise has been made by Associate or TMS or any other Releasee concerning the subject matter of this Agreement, and that all agreements and understandings between the Parties concerning the subject matter of this Agreement are embodied and expressed in this Agreement.  This is an integrated document.

8.10.     Counterparts.  This Agreement may be signed in one or more counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same agreement.

**IMPORTANT:   PLEASE READ THIS AGREEMENT CAREFULLY BEFORE SIGNING IT.  IT CONTAINS A GENERAL AND COMPLETE RELEASE OF ALL KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED CLAIMS**

I have carefully reviewed the terms of this Agreement and I understand, accept and agree to all of its provisions and hereby sign this Agreement voluntarily and with full understanding of its legal force and effect.

Initials:  _____     _____
            Butler       TMS

ASSOCIATE

_____
Dimitrios P. Biller

DATE: 9/6 , 2007

TOYOTA MOTOR SALES, U.S.A., INC.

BY: _____

TITLE: Sr. Vice President and General Counsel

DATE: 9/18 , 2007

Pursuant to Paragraph 3 (Waiver and Complete Release) of this Agreement, providing for and requiring on or after Separation Date the re-execution of this Agreement and General Release contained herein from Associate, and in return for the consideration stated in Paragraph 2.4 (Forgiveness of Loans), Associate re-executes this Agreement.

ASSOCIATE

_____
Dimitrios P. Biller

DATE: _____, 2007

APPROVED AS TO FORM AND CONTENT

_____
Michael J. Faber

DATE: 9/6 , 2007

APPROVED AS TO FORM AND CONTENT

_____
Alan B. Carlson

DATE: 9/7 , 2007

Initials: _____ _____
        Biller   TMS

**ASSOCIATE**

**TOYOTA MOTOR SALES. U.S.A., INC.**

_____
Dimitrios P. Biller

BY: _____

TITLE: _____

DATE: _____, 2007

DATE: _____, 2007

**Pursuant to Paragraph 3 (Waiver and Complete Release) of this Agreement, providing for and requiring on or after Separation Date the re-execution of this Agreement and General Release contained herein from Associate, and in return for the consideration stated in Paragraph 2.4 (Forgiveness of Loans), Associate re-executes this Agreement.**

**ASSOCIATE**

_____
Dimitrios P. Biller

DATE: _9/17_, 2007

**APPROVED AS TO FORM AND CONTENT**

_____
Michael J. Faber

DATE: _____, 2007

**APPROVED AS TO FORM AND CONTENT**

_____
Alan B. Carlson

DATE: _____, 2007

Initials: _____  _____
Biller    TMS

14



**EXHIBIT "3"**

Your decision to resign was a significant loss to Toyota. However, I am sure that you will continue to succeed in the future because of your qualities as a lawyer and your dedication to work endlessly for the benefit of your clients and employer.

I wish you the best and your continued success in the future

Sincerely yours,

Christopher P. Reynolds
Vice President and General Counsel